**No. 23-50491**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

CAREER COLLEGES AND SCHOOLS OF TEXAS,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF EDUCATION and MIGUEL
CARDONA, Secretary, U.S. Department of Education, in his official capacity as the
Secretary of Education,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Western District of Texas

———————————

## RESPONSE TO RENEWED MOTION FOR INJUNCTION PENDING
## APPEAL

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

MARK B. STERN
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ............................................................. 1

STATEMENT OF THE CASE ................................................................... 2

      A.    Statutory and Regulatory Background ....................................... 2

      B.    The Challenged Rule ............................................................. 4

      C.    Factual and Procedural Background ........................................ 6

ARGUMENT ...................................................................................... 7

I.     CCST Has Not Established Irreparable Harm ..................................... 8

II.    CCST Has Not Established a Likelihood of Success on the Merits ................ 14

III.   The Remaining Equitable Factors Weigh Against CCST's Requested
      Relief ......................................................................................... 20

CONCLUSION .................................................................................... 21

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Aransas Project v. Shaw,*
  775 F.3d 641 (5th Cir. 2014) ....................................................... 9

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,*
  430 U.S. 442 (1977) ................................................................. 17

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ................................................................. 21

*Chauffeur's Training Sch., Inc. v. Spellings,*
  478 F.3d 117 (2d Cir. 2007) ....................................................... 17

*Google, Inc. v. Hood,*
  822 F.3d 212 (5th Cir. 2016) ....................................................... 9

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................... 8

*Perez v. Mortgage Bankers Ass'n,*
  575 U.S. 92 (2015) ................................................................... 19

*Restaurant Law Ctr. v. U.S. Dep' of Labor,*
  66 F.4th 593 (5th Cir. 2023) ....................................................... 12

*Sweet v. Cardona,*
  No. C 19-03674 WHA, 2022 WL 16966513 (N.D. Cal. Nov. 16, 2022) ............... 16

*Texas Oil & Gas Ass'n v. U.S. EPA,*
  161 F.3d 923 (5th Cir. 1998) ....................................................... 19

*Topletz v. Skinner,*
  7 F.4th 284 (5th Cir. 2021) ......................................................... 8

*U.S. Dep't of Educ., In re,*
  25 F.4th 692 (9th Cir. 2022) ..................................................... 1, 2

*Vara v. Devos,*
  No. 19-12175-LTS, 2020 WL 3489679 (D. Mass June 25, 2020) .................... 16

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ............................................................. 18

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................ 8


**Statutes:**

Higher Education Act of 1965:
    20 U.S.C. § 1070 *et seq.* ................................................................ 2
    20 U.S.C. § 1087(c) ................................................................ 2, 5, 12
    20 U.S.C. § 1087(c)(1) ................................................................ 20
    20 U.S.C. § 1087d(a)(3) ................................................................ 17
    20 U.S.C. § 1087e(h) ................................................ 1, 2, 15, 17


**Regulations:**

34 C.F.R. § 685.206(c)(2) ................................................................ 3

34 C.F.R. § 685.222(e) ................................................................ 4

34 C.F.R. § 685.402 ................................................................ 19


**Rule:**

Fed. R. App. P. 8(a)(1) ................................................................ 2


**Other Authorities:**

59 Fed. Reg. 61,664 (Dec. 1, 1994) ................................................ 2, 3

60 Fed. Reg. 37,768 (July 21, 1995) ................................................ 3

81 Fed. Reg. 75,926 (Nov. 1, 2016) ................................................ 2, 3, 14

84 Fed. Reg. 49,788 (Sept. 23, 2019) ................................................ 2, 3, 14, 15

87 Fed. Reg. 65,904 (Nov. 1, 2022) ................................ 4, 5, 6, 9, 13, 14, 15, 19, 20, 21

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d
    ed.), Westlaw (database updated Apr. 2023) ................................................ 11

## INTRODUCTION AND SUMMARY

Through Title IV of the Higher Education Act of 1965 (HEA), Congress has "allowed for the cancellation of federal student loans in certain cases of school misconduct" pursuant to a process known as borrower defense. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 695 (9th Cir. 2022). To implement that process, Congress has directed the Secretary of Education to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment." 20 U.S.C. § 1087e(h). Pursuant to this directive and other statutory authorities, the Secretary promulgated the rule challenged here, which specifies the acts or omissions that entitle borrowers to relief and establishes procedures to govern the Department's consideration of such claims.

Five months after the rule's promulgation, Career Colleges & Schools of Texas (CCST)—a trade association—sought a preliminary injunction, contending that various provisions of the challenged rule are illegal. The district court denied that motion, finding that the regulation does not threaten any irreparable injury to CCST or its member schools. CCST's motion for an injunction pending appeal casts no doubt on the propriety of that finding. Because a showing of irreparable injury is a prerequisite for an injunction pending appeal and the district court did not abuse its discretion, CCST's motion should be denied. Independently, CCST has not established a likelihood of success on the merits or that the public interest would justify the extraordinary relief that it seeks.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

Under Title IV of the HEA, 20 U.S.C. § 1070 *et seq.*, the Secretary of Education is charged with administering certain federal student loan programs, including the Federal Direct Loan Program, which allows students to receive Direct Loans from the federal government to pay for educational expenses.  The HEA also provides the Department of Education the authority to relieve borrowers of the obligation to repay student loans in some circumstances, two of which are relevant here.  First, the HEA requires loan discharge in certain circumstances where the student "is unable to complete the program" in which they enrolled "due to the closure of the institution." 20 U.S.C. § 1087(c).  Second, the HEA anticipates that the Secretary may authorize the "cancellation of federal student loans in certain cases of school misconduct" pursuant to the process known as borrower defense.  *In re U.S. Dep't of Educ.*, 25 F.4th at 695.  As relevant here, 20 U.S.C. § 1087e(h) provides that the Secretary must specify by regulation "which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan."

Over the past 30 years, the Department has carried out the HEA's instructions to promulgate regulations specifying the type of misconduct giving rise to borrower-defense claims as well as the relevant administrative procedures for adjudicating those claims.  59 Fed. Reg. 61,664 (Dec. 1, 1994); 81 Fed. Reg. 75,926 (Nov. 1, 2016); 84 Fed. Reg. 49,788 (Sept. 23, 2019).  The first set of regulations, issued in 1994,

2

provided that "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law" could be asserted by borrowers as a defense to repayment in "any proceeding" to collect on the loan.  59 Fed. Reg. at 61,696.  The rule further provided that the Secretary "may initiate an appropriate proceeding" to recoup funds from the school that committed the act or omission that resulted in the borrower's successful defense against repayment.  *Id.*  The Department later explained that these provisions were intended to continue in the Direct Loan program the same potential liability for institutions that existed under the long-standing Federal Family Education Loan program, *see* 60 Fed. Reg. 37,768 (July 21, 1995)—a program which allowed borrowers to assert "both claims and defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings," 81 Fed. Reg. at 75,956.

In recent years, the Department has made several revisions to the standards and procedures for borrower-defense claims.  First, in 2016, the Department issued a rule that streamlined the process for reviewing the surge of borrower-defense claims the Department had begun to receive after the high-profile collapse of one of the nation's largest for-profit colleges.  34 C.F.R. §§ 685.206(c)(2), 685.222(e).  In 2019, the Department again revised the standards for processing borrower-defense claims.  *See* 84 Fed. Reg. 49,788.  In each iteration, however, the Department left the framework for borrower discharge and institutional liability largely intact.  In both

3

revisions, the Department declared that it would continue to accept "affirmative" borrower-defense claims from borrowers who had not yet defaulted. *E.g.*, *id.* at 49,795-97. Where the Department concluded that the defenses were valid, schools would continue to face the possibility of financial liability for resulting losses to the taxpayer. *Id.* at 49,790.

### B.    The Challenged Rule

The current appeal challenges a final rule issued by the Department in November 2022, which again updated regulations governing borrower-defense discharges, along with other provisions affecting a broad swath of statutory programs. 87 Fed. Reg. 65,904 (Nov. 1, 2022) (Rule). Like the 2016 and 2019 rules, the 2022 Rule creates a uniform federal standard for defining the acts and omissions that a Direct Loan borrower can assert as a defense to repayment. The Rule states that, for all loans disbursed on or after July 1, 2023, and with respect to all applications pending as of that date, the following categories of acts or omissions can give rise to a successful defense to repayment: (i) substantial misrepresentations that mislead a borrower, (ii) substantial omissions of fact, (iii) failures to perform contract obligations, (iv) uses of aggressive and deceptive recruitment methods, (v) conduct resulting in a judgment by a court or administrative tribunal favorable to the borrower, or (vi) adverse action by the Department against the institution based on an act or omission that could give rise to a borrower defense claim. *Id.* at 66,068-69. Ultimately, however, relief will be awarded to the borrower only upon the

Department's conclusion by a "preponderance of the evidence that the institution committed an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting . . . relief." *Id.* at 66,068.

The Rule also provides that the institution alleged to have committed acts or omissions giving rise to a borrower's defense to repayment will receive notice of the borrower's claim and be provided an opportunity to respond during the pendency of that claim. 87 Fed. Reg. at 66,068. However, "[t]he loan discharge process is separate from any recoupment proceeding that the Secretary elects to pursue against an institution." *Id.* at 65,913. Among other things, if the Department approves a borrower defense and later chooses to seek recoupment for discharged debt, it must provide the institution separate written notice, an opportunity to present evidence, and a hearing during which the institution may argue that the decision to discharge the loans was incorrect or that the institution is not liable for the amounts discharged. *Id.* at 66,041, 66,072-73. In addition, the Rule does not permit recoupment unless "the actions or omissions that led to" the approval of a borrower-defense claims "would also have violated the borrower defense regulations in effect when those loans were first disbursed." *Id.* at 65,913, 65,951.

Finally, the Rule amends the Department's existing closed-school discharge regulations. As noted above, 20 U.S.C. § 1087(c) provides for relief to certain borrowers who are "unable to complete the program in which" the student enrolled "due to the closure of the institution." As relevant here, the Rule provides that a

school is not "closed" unless it has ceased overall operations.  87 Fed. Reg. at 66,060.

If so, the Department considers the school's closure date to be the earlier of the date

"that the school ceased to provide educational instruction in programs in which most

students at the school were enrolled" or the date "that reflects when the school ceased

to provide educational instruction for all of its students."  *Id.*

### C.    Factual and Procedural Background

**1.**  Five months after the Rule's promulgation, CCST initiated this lawsuit and

moved for a preliminary injunction.  On June 30, 2023—after holding an extensive

evidentiary hearing and oral argument—the district court denied CCST's motion,

concluding that it had failed to establish irreparable harm sufficient to warrant

equitable relief.  As the court explained, CCST had not identified any certain or

immediate injury likely to arise from the Department's new standards for determining

whether to relieve borrowers of the obligation to repay student loans.  Among other

things, CCST had "not identified any pending or anticipated" borrower-defense

claims against its members, much less any claims likely to be granted by the

Department under the Rule.  App.522.  Even if such claims were granted, CCST's

members would not face financial liability unless the Department initiated and

subsequently prevailed in a "separate recoupment action" brought against the school.

App.522-523.

The court found equally unpersuasive CCST's claim that its members will

suffer irreparable harm in the form of resources diverted toward complying with the

Rule.  As the court explained, "the record indicates that most of the costs described by CCST and its members have already been incurred" as part of preparatory efforts beginning in November 2022.  App.527.  And CCST's references to forward-looking costs "provide no meaningful information about the specific nature or extent of these costs," much less any "concrete indication" that the Rule imposes "more than a de minimis burden in comparison to the schools' pre-existing compliance expenses." App.528; App.530.  Similarly, the court found that there was no evidence of any "concrete harm that CCST's members might suffer" from the Rule's closed-school discharge provisions.  App.525.

**2.**  Shortly before the district court denied CCST's motion, CCST filed an original action in this Court, *In re Career Colls.*, No. 23-50489 (5th Cir.), and requested an administrative stay of the Rule as well as an injunction pending appeal.  Thereafter, CCST filed this notice of appeal.  This Court issued a 21-day administrative injunction limited to CCST and its member schools and set a briefing schedule that would apply to any renewed motion for an injunction pending appeal in this case.  One week later, without first applying for relief in the district court, *see* Fed. R. App. P. 8(a)(1), CCST filed a renewed motion for an injunction pending appeal.

## ARGUMENT

CCST's motion should be denied.  In addition to failing to first apply for relief in district court, Fed. R. App. P. 8(a)(1), CCST has failed to satisfy any of the factors governing the issuance of the extraordinary relief it seeks: "(1) whether the stay

applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.    CCST Has Not Established Irreparable Harm

**A.**  A preliminary injunction is an "extraordinary remedy" that may not be granted unless the movant establishes (among other things) that it is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  This Court reviews the district court's evaluation of this equitable factor only for an abuse of discretion.  *See Topletz v. Skinner*, 7 F.4th 284, 293 (5th Cir. 2021).

The district court correctly found that CCST failed to establish that it would likely suffer irreparable harm in the absence of an injunction.  The challenged provisions of the Rule define the circumstances that may give rise to discharge of a federal Direct student loan based upon an action or omission by the borrower's school.  The Department's decisions to grant such relief do not directly implicate the rights or responsibilities of CCST's members.  CCST nevertheless asserts that its members are injured by the borrower-discharge provisions on the theory that the schools' contemporary conduct could one day lead to a borrower-defense claim, and, if that claim is granted, the Department could then seek to hold the school liable for any discharged loans in a hypothetical recoupment proceeding.  As the district court

correctly recognized, that potential future liability is neither sufficiently immediate nor certain to warrant preliminary injunctive relief, and thus cannot warrant an injunction pending appeal that is the subject of the present motion.  *See Aransas Project v. Shaw*, 775 F.3d 641, 663-64 (5th Cir. 2014) (per curiam) ("An injunction may thus be issued only if future injury is 'certainly impending.'").

The district court explained that "CCST has not identified any pending or anticipated [borrower-defense] claims against its members."  App.522.  And even assuming some student at some CCST member school will someday assert a borrower-defense claim to repayment, that assertion would not itself constitute an injury to CCST.  Instead, any potential pecuniary injury to the school would require the Department to first accept the borrower defense claim and then exercise its discretion to "initiate a separate recoupment action against the school."  App.523; *see, e.g.*, 87 Fed. Reg. at 65,909.  The school would then be able to contest its financial liability in an adjudication before the agency and seek judicial review of any final recoupment decision.  Nothing about that chain of speculative hypotheticals suggests that any of CCST's members face a reasonably certain threat of imminent and irreparable harm during the pendency of this appeal.  *See Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016) (holding that "the possibility of some future enforcement action" at an unspecified point in time does not "create[] an imminent threat of irreparable injury ripe for adjudication").

9

**B.**  CCST's motion raises three other possible sources of harm: (1) "compliance costs" associated with "defensively" preserving records and training employees, (2) costs associated with changing business plans to avoid perceived liability under the closed-school discharge provisions of the Rule, and (3) allegedly imminent threats of "being subject to unlawful adjudications."  The district court correctly concluded that none of these alleged harms were sufficient to warrant the extraordinary relief that CCST seeks.

**1.**  CCST first suggests (Mot. 13-15) that, although not required by the Rule, its member schools feel the need to "defensively" preserve records and train employees to adequately shield themselves from liability in the event of a future recoupment action.  But as the district court explained, CCST's witnesses and declarants made clear that their "preparatory compliance efforts have been underway for months, and at least since the final Rule was published in November 2022."  App.527.  These already-incurred costs "cannot form the basis for injunctive relief."  *Id.*

Moreover, CCST has "provide[d] only nebulous and conclusory descriptions" of the specific nature or extent of any allegedly forward-looking costs of recordkeeping or training.  App.527-528.  These vague descriptions are insufficient to support a preliminary injunction, particularly considering the "clear evidence that CCST's member schools have historically devoted resources to compliance with Title IV programming requirements," including "employ[ing] significant staff whose job duties include ensuring compliance" with federal and state regulations.  App.528-

App.529.  That CCST's members intend to "continue" these efforts (Mot. 16) does not establish that the Rule imposes "more than a de minimis burden in comparison to the schools' pre-existing compliance expenses."  App.528.

Nor does CCST advance its argument (Mot. 17-18) by citing isolated testimony that ECPI University has, in recent months, elected to spend "two to three times" as much time training university staff—the vast majority of whom primarily service campuses which are not members of CCST—to avoid misrepresentations that could provide the basis for borrower defenses to repayment.  Even to the extent that these training costs remain ongoing, CCST does not explain how these trainings differ from those that were admittedly conducted prior to the Rule, or why ECPI believes these trainings—which are not a requirement of the Rule—are now necessary.  *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.), Westlaw (database updated Apr. 2023) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").

Similarly, CCST notes (Mot. 18) that Lincoln Tech schools are engaging in preparatory activities such as "allocating staff and resources" and "upgrading recordkeeping systems" to deal with what it speculates will be a "flood of meritless borrower defense claims" under the Rule.  But the speculative threat of hypothetical future claims that may one day lead to a recoupment action cannot itself support injunctive relief, and there is no basis whatsoever for concluding that an institution of higher education that is inclined to "defensively" retain records as part of a forward-

11

looking litigation strategy would change that plan based on the grant or denial of a temporary injunction pending appeal.

CCST's reliance upon this Court's decision in *Restaurant Law Center v. U.S. Department of Labor*, 66 F.4th 593, 600 (5th Cir. 2023) underscores the error of its analysis. That case concerned the Department of Labor's standards regarding when restaurant owners and other businesses may claim a "tip credit" and legally pay their tipped employees less than the federal minimum wage. In holding that two organizations representing restaurant owners had sufficiently established irreparable injury as a result of the regulation's new standards, this Court noted that the regulation itself "conce[des] that some businesses will incur ongoing costs to ensure they can continue to claim a tip credit" and that the plaintiffs had "introduced evidence that their members" were required by the regulation to "incur exactly the kinds of continuing compliance costs predicted by the [rule] itself." *Id.* at 598. The district court correctly found that no equivalent evidence exists here. App.530.

**2.** CCST's suggestion (Mot. 19-20) that its members will be irreparably harmed by the Rule's closed-school discharge regulations is even more vague and attenuated. As discussed above, the HEA requires loan discharge in certain circumstances where a student "is unable to complete the program" in which they enrolled "due to the closure of the institution." 20 U.S.C. § 1087(c). The current Rule provides that an institution which has entirely ceased operation is "closed" for this purpose as of the earlier of the date "that the school ceased to provide educational instruction in

programs in which most students at the school were enrolled" or the date "that

reflects when the school ceased to provide educational instruction for all of its

students." 87 Fed. Reg. at 66,060. CCST does not explain how its members will be

injured by this definition in the absence of an injunction pending appeal. CCST notes

(Mot. 19) that its member schools have reconsidered plans to consolidate or open

campuses, but the district court found that these changes were not motivated by the

closed-school discharge provisions. App.525. Furthermore, as discussed above, any

asserted concerns regarding potential liability in the event of a recoupment proceeding

after borrowers receive discharges under these provisions is based on causal chains

that "remain[] several steps away" and "are too remote to constitute irreparable

harm." App.525-526.

**3.** CCST also briefly suggests (Mot. 20-21) that its members face the threat of

having to participate in unlawful adjudications under the Rule. Again, however, the

threat of such adjudications is entirely speculative; "CCST has not identified any

pending or anticipated [borrower-defense] claims against its members." App.522.

And although CCST complains that its schools will be required to respond to any

future claim within 90 days of the claim filing, it provides no evidence regarding the

cost of responding to a hypothetical claim, nor does it demonstrate why such a

possibility would justify an injunction pending appeal.

Similarly, CCST does not explain why the threat of future recoupment

proceedings warrants preliminary injunctive relief. First, borrower defense and

recoupment are separate proceedings under the Rule, and any uncertainty about the lawfulness of the Department's ability to seek recoupment cannot justify enjoining provisions which govern discharge. CCST also does not explain how an injunction pending appeal would cure its members' concerns about the threat of participating in allegedly unlawful administrative recoupment proceedings. As CCST appears to acknowledge, this feature is not unique to the challenged Rule. Since the inception of the Direct Loan Program, the Department's regulations have provided that schools may be held "liable for losses incurred through borrower defense," and defined "administrative procedures to determine and liquidate those claims." 81 Fed. Reg. at 75,931. Indeed, all prior versions of the Department's borrower-defense regulations have contemplated recoupment actions of the type CCST now complains. *See* 87 Fed. Reg. at 65,948; 84 Fed. Reg. at 49,838.

## II.     CCST Has Not Established a Likelihood of Success on the Merits

As discussed above, the district court's finding that CCST has failed to establish irreparable harm was correct and certainly not an abuse of discretion. The district court thus did not reach the other factors for granting preliminary relief, and there is no reason for this Court to evaluate those factors on this request for an emergency injunction pending appeal. Were the Court to reach these questions, they would independently require denial of the motion.

**A.** CCST has not established a likelihood that it will prevail on its claim that the Secretary lacks authority to promulgate the challenged Rule. The HEA clearly

establishes that borrowers have the right to raise "defense[s] to repayment" of their federal student loans based on certain "acts or omissions of an institution of higher education" and that the Secretary has the authority to "specify in regulations" which "acts or omissions" constitute such a defense.  20 U.S.C. § 1087e(h).  The challenged portions of the Rule do exactly that; they define the acts or omissions giving rise to a defense to repayment and the procedures that the Secretary will use to determine whether to discharge the borrower's loans.

CCST nevertheless claims (Mot. 6-7) that the Rule exceeds the Department's authority because, in its view, borrowers cannot assert a "defense" to repayment until a debt-collection proceeding.  But the statute does not limit when a "defense to repayment" may first be raised.  20 U.S.C. § 1087e(h).  Further, as the Rule explains, "the concept of 'repayment' is widely understood to encompass not just borrowers in default but also those actively repaying their loans."  87 Fed. Reg. at 65,914.  It is the "existing obligation to repay"—not the pendency of a formal action to collect a defaulted loan—that gives rise to a "defense to repayment."  *Id.*

By contrast, CCST's assumption that borrowers may only assert "defense[s] to repayment" in response to involuntary proceedings, such as offset or wage garnishment, would give borrowers the choice of either "intentionally defaulting in the hopes that a [borrower-defense] claim is successful" or continuing to make payments on "a loan that potentially should be discharged."  87 Fed. Reg. at 65,914; *see also* 84 Fed. Reg. at 49,796 (noting problems associated with a regime that

15

"provide[d] borrowers with an incentive to default"). The HEA does not require students to take one of these courses before asserting a valid claim that repayment is not warranted.

CCST's other arguments in support of its atextual reading of the statute are equally unavailing. First, CCST argues (Mot. 7) that Congress did not "expressly confer" upon the Department the authority "to adjudicate claims for money against the United States." Thus, in CCST's view, the Department lacks authority to determine the validity of a particular borrower's defense to repayment, giving borrowers the unpalatable choices described above. To substantiate this contention, CCST cites a handful of cases that have held that an express waiver of sovereign immunity is required before the United States may be held liable for monetary damages in court. Those cases have no relevance here. *See, e.g.*, *Sweet v. Cardona*, No. C-19-03674-WHA, 2022 WL 16966513, at *13 (N.D. Cal. Nov. 16, 2022) ("Discharge of an obligation to repay a debt does not constitute monetary damages."). CCST also cites cases stating that Congress typically speaks clearly when it intends to grant agencies the authority to adjudicate liability disputes between private parties. But those cases likewise cast no doubt on an agency's authority to determine the circumstances under which it is appropriate to discharge a borrower's obligation to repay a federally owned debt in response to a borrower's affirmative assertion of a statutory defense to repayment. *See Vara v. Devos*, No. 19-12175-LTS, 2020 WL

16

3489679 (D. Mass June 25, 2020) (holding that the HEA *requires* the Department to adjudicate borrower-defense applications).

Next, CCST argues (Mot. 8) that the portions of the Rule governing recoupment violate the Seventh Amendment's guarantee of jury trial. As the Supreme Court has explained, however, "Congress is free to provide an administrative enforcement scheme without the intervention of a jury." *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 448 (1977). And as CCST appears to recognize (Mot. 7), Congress has expressly required that schools participating in the Title IV Federal student financial aid programs accept all financial liability stemming from failure to perform the functions set forth in their Title IV participation agreement, 20 U.S.C. § 1087d(a)(3), including, as here, where the loss is the result of acts or omissions giving rise to a borrower defense to repayment, *id.* § 1087e(h). Courts have long recognized that these provisions, coupled with the Department's broad authority to administer the Title IV program, grant the Department the authority to administratively assess an institution's liability under Title IV, subject to judicial review under the Administrative Procedure Act. *See, e.g., Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 125-30 (2d Cir. 2007) (upholding Department's authority to "administratively assess a liability for loan program violations" even where the HEA was "silent" with respect to the particular context at issue).

Finally, in a single paragraph, CCST asserts (Mot. 8) that the Rule violates the major questions doctrine. But that doctrine is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). As explained above, the features of the Rule that CCST challenges—providing for the assertion and adjudication of borrower defense to repayment claims based on institutional misconduct—are based on a statutory provision that requires the Department to define the circumstances under which borrowers can assert such a defense. To the extent these provisions affect schools at all, they operate as conditions on the receipt of federal funds, applicable only to the entities that choose to participate in a federal program administered by the Department. The Rule does not apply outside the Department's contractual relationships or the field of federal student financial aid and is thus in the heartland of the Department's statutory expertise.

**B.** CCST is also not likely to prevail on its various other arguments that the Rule is invalid under the Administrative Procedure Act. First, CCST generally argues (Mot. 8-11) that the Rule's standards are not adequately explained or else lack sufficient "specificity" to allow regulated parties to "conform their conduct." But that characterization cannot be squared with the regulation's text or the reasoned explanation for the Department's policy choices set forth in the preamble to the Rule. That CCST disagrees (Mot. 10) with the Department's explanations or policy choices

is not a sufficient basis to invalidate the Rule. *See Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998) ("If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld.").

CCST's challenge (Mot. 10-11) to the Rule's procedures for reviewing group claims is equally meritless. Under those provisions, the Secretary may consider together claims of similarly situated borrowers who attended a common institution and who have defenses to repayment based upon the acts and omissions of that institution out of the same period. 24 C.F.R. § 685.402. That reflects the Department's experience that widely disseminated misrepresentations (such as misrepresenting employment rates in mass communications to prospective students) will often affect many borrowers in substantially the same way. 87 Fed. Reg. at 65,937. There is nothing unreasonable about efficiently resolving these virtually identical claims without the need for individual adjudications. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 102 (2015) ("[C]ourts lack authority 'to impose upon an agency its own notion of which procedures are "best"' . . . .") (alteration omitted)).

Finally, CCST mischaracterizes (Mot. 11-12) the Rule's closed-school discharge provisions. The Rule makes clear that a "school that has remained open would not be considered a closed school." 87 Fed. Reg. at 65,966. The Rule thus does not expand the overall scope of closed schools, it only "establish[es] a closure date for a school that has ceased overall operations." *Id*. And the Rule's interpretation of the operative statutory phrase is reasonable: it reflects a common-sense understanding of when a

borrower's inability to complete a program would be "due to" closure of the school

within the meaning of the statute.  20 U.S.C. § 1087(c)(1); *see also* 87 Fed. Reg. at

65,966 (explaining that the definition protects "against a situation where an institution

could intentionally keep a single, small program open long enough to . . . deny[]

closed school discharges to borrowers").

## III.   The Remaining Equitable Factors Weigh Against CCST's Requested Relief

As noted above, CCST's alleged injuries are entirely speculative and, in any

event, insufficient to constitute irreparable injury directly attributable to the Rule.

Even if this Court concludes that CCST has adequately established some irreparable

injury, that threatened injury plainly could not outweigh the damage that an injunction

would cause the public interest.  As the Rule explains, both Congress and the

Department have found it in the public interest to ensure that borrowers harmed by

the misconduct of their schools can access debt relief.  The Rule represents significant

steps toward those goals, and the balance of harms thus tilts decisively against an

injunction pending appeal.

CCST's request is even more clearly without basis because it asks for a broad

and nationwide injunction of the Rule that would far exceed the scope of the

administrative injunction that was properly limited to the parties.  Similarly out of

proportion is CCST's request for this Court to enjoin the Rule in its entirety, including

portions of the Rule that it does not challenge and for which it has not even

attempted to demonstrate a likelihood of success on the merits. *See* 87 Fed. Reg. at 66,042, 66,073 (noting that the Department intended for the Rule's provisions to be severable). CCST's contrary request (Mot. 23-24) contravenes constitutional limitations on judicial power and general principles of equity. *E.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").

## CONCLUSION

For the foregoing reasons, the motion for an injunction pending appeal should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARK B. STERN

*/s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7710*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9039*
*Jennifer.l.utrecht@usdoj.gov*

July 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


/s/ Jennifer L. Utrecht
Jennifer L. Utrecht

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,147 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht