No. 23-50491

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

CAREER COLLEGES AND SCHOOLS OF TEXAS,

*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, Secretary, U.S. Department of Education, in his official capacity as the Secretary of Education,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
No. 1:23-cv-00433-RP

## BRIEF OF AMICI CURIAE PUBLIC CITIZEN AND PROJECT ON PREDATORY STUDENT LENDING IN SUPPORT OF APPELLEES

Rebecca Eisenbrey
Project on Predatory Student
  Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
(617) 322-2808

Adam R. Pulver
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

Counsel for Amici Curiae

October 10, 2023

## AMICI CURIAE'S SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS PURSUANT TO FIFTH CIRCUIT RULE 29.2

---

No. 23-50491

---

CAREER COLLEGES AND SCHOOLS OF TEXAS,

*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, Secretary, U.S. Department of Education, in his official capacity as the Secretary of Education,

*Defendants-Appellees*.

---

Pursuant to this Court's Rule 29.2 and Federal Rule of Appellate Procedure 26.1, amici curiae Public Citizen and Project on Predatory Student Lending submit this supplemental certificate of interested persons to fully disclose all those with an interest in the amicus brief and provide the required information as to their corporate status and affiliations.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case, in addition to those listed in the briefs of the parties. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

i

A.    Amicus curiae **Public Citizen, Inc.**, is a non-profit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

B.    Amicus curiae **Project on Predatory Student Lending** is a non-profit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

C.    Amici are represented by **Adam R. Pulver** and **Allison M. Zieve** of **Public Citizen Litigation Group**, which is a non-profit, public interest law firm that is part of **Public Citizen Foundation, Inc.**, a non-profit, non-stock corporation that has no parent corporation and in which no publicly traded corporation has an ownership interest of any kind.

D.    Amici are also represented by **Rebecca Eisenbrey** of **Project on Predatory Student Lending.**

/s/ Adam R. Pulver
Adam R. Pulver
*Counsel for Amici Curiae*

October 10, 2023

# TABLE OF CONTENTS

AMICI CURIAE'S SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS PURSUANT TO FIFTH CIRCUIT RULE 29.2 ...................................................................................................i

TABLE OF AUTHORITIES...................................................................iv

INTEREST OF AMICI CURIAE............................................................1

INTRODUCTION..................................................................................2

ARGUMENT .........................................................................................7

I.    Since the statute's enactment, the Department has consistently understood it to authorize "affirmative claims." ...........................7

    A.    Pre-default defenses under the 1994 Rule ..............................8

    B.    Pre-default defenses under the 2016 Rule ...........................13

    C.    Pre-default defenses under the 2019 Rule ...........................15

    D.    Pre-default defenses under the 2022 Rule ...........................17

II.   The statute authorizes pre-default consideration of a borrower's "defenses to repayment." .................................................................19

    A.    "Defenses to repayment" under the statute include defenses raised pre-default. .................................................................20

    B.    Pre-default defenses to repayment of outstanding loans are not private rights of action...................................................25

III.  The equities weigh against a preliminary injunction. ...................26

CONCLUSION ....................................................................................30

CERTIFICATE OF SERVICE..............................................................32

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ....33

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*AFL-CIO v. Kahn,*
   618 F.2d 784 (D.C. Cir. 1979) ................................................................. 19

*Biden v. Missouri,*
   595 U.S. 87 (2022) ..................................................................................... 19

*Chamber of Commerce of United States of America v. U.S.*
   *Department of Labor,*
   885 F.3d 360 (5th Cir. 2018) .............................................. 7, 23, 25, 26

*Louisiana v. Biden,*
   55 F.4th 1017 (5th Cir. 2022) ............................................................... 19

*Mississippi ex rel. Hood v. AU Optronics Corp.,*
   571 U.S. 161 (2014) ................................................................................. 25

*Trump v. International Refugee Assistance Project,*
   582 U.S. 571 (2017) ........................................................................... 26, 27

*Vara v. DeVos,*
   No. CV 19-12175-LTS, 2020 WL 3489679 (D. Mass. June 25, 2020) .... 9

*Watt v. Alaska,*
   451 U.S. 259 (1981) ................................................................................... 7

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) .............................................................................. 7

*Winter v. Natural Resources Defense Council,*
   555 U.S. 7 (2008) ..................................................................................... 27

**Statutes**

20 U.S.C. § 1087(c)(1) ................................................................................. 4

20 U.S.C. § 1087a(b)(2) .................................................................. 24

20 U.S.C. § 1087c ............................................................................ 3

20 U.S.C. § 1087d(a)(6) .................................................................. 3

20 U.S.C. § 1087e(b)(9) ................................................................ 21

20 U.S.C. § 1087e(d) ............................................................... 21, 22

20 U.S.C. § 1087e(e) ...................................................................... 21

20 U.S.C. § 1087e(f) ......................................................................... 3

20 U.S.C. § 1087e(h) ........................................................... *passim*

20 U.S.C. § 1087j ............................................................................ 3

20 U.S.C. § 1094(c) ......................................................................... 3

20 U.S.C. §§ 1098d–f ...................................................................... 3

20 U.S.C. § 1221e-3 ...................................................................... 16

Higher Education Amendments of 1992, Pub. L. 102–325, § 1403(a), 106 Stat. 817 ................................................................................. 22, 23

Student Loan Reform Act of 1993, Pub. L. 103–66, 107 Stat. 351 ..... 4, 23

**Regulatory Materials**

16 C.F.R. § 433.2 .......................................................................... 12

34 C.F.R. § 30.35 ............................................................................ 9

34 C.F.R. § 685.109 ...................................................................... 30

34 C.F.R. § 685.206(c) (1994) ..................................................... 8, 9

34 C.F.R. § 685.206(c) (2016) .................................................. 14

34 C.F.R. § 685.212 .................................................................. 30

34 C.F.R. § 685.401(b) ........................................................ 17, 18

34 C.F.R. § 685.409 .................................................................. 30

Department of Education, Final Regulations, Institutional Eligibility
    Under the Higher Education Act of 1965, as Amended, Student
    Assistance General Provisions, Federal Perkins Loan Program,
    Federal Family Education Loan Program, and William D. Ford
    Federal Direct Loan Program, 87 Fed. Reg. 65904
    (Nov. 1, 2022) ................................................................. *passim*

Department of Education, Notice of Proposed Rulemaking, Student
    Assistance General Provisions, Federal Perkins Loan Program,
    Federal Family Education Loan Program, and William D. Ford
    Federal Direct Loan Program,
    87 Fed. Reg. 41878 (July 13, 2022) ...................................... 17

Department of Education, Final Rule, Student Assistance General
    Provisions, Federal Family Education Loan Program, and
    William D. Ford Federal Direct Loan Program,
    84 Fed. Reg. 49788 (Sept. 23, 2019) ............................... *passim*

Department of Education, Notice of Proposed Rulemaking, Student
    Assistance General Provisions, Federal Perkins Loan Program,
    Federal Family Education Loan Program, and William D. Ford
    Federal Direct Loan Program,
    83 Fed. Reg. 37242 (July 31, 2018) ...................................... 15

Department of Education, Final Regulations, Student Assistance
General Provisions, Federal Perkins Loan Program, Federal Family
Education Loan Program, William D. Ford Federal Direct Loan
Program, and Teacher Education Assistance for College and Higher
Education Grant Program,
81 Fed. Reg. 75926 (Nov. 1, 2016) ............................................... *passim*

Department of Education, Notice of the results of the first meeting
of the Borrower Defenses Regulations Negotiated Rulemaking
Advisory Committee; Notice of Interpretation, 60 Fed. Reg. 37668
(Jul. 21, 1995) ................................................................................ 11, 24

Department of Education, Final Regulations, William D. Ford
Federal Direct Loan Program,
59 Fed. Reg. 61664 (Dec. 1, 1994) ..................................................... 8, 12

Department of Education, Notice of Proposed Rulemaking, Federal
Direct Student Loan Program,
59 Fed. Reg. 42646 (Aug. 18, 1994) ......................................................... 8

**Other Agency Materials**

Arne Duncan, Secretary of Education, Letter to Sen. Elizabeth Warren,
Aug. 4, 2014,
https://protectborrowers.org/wp-content/uploads/2023/10/2014.08.04-
USED-LTR-to-Senators-re-COCO-1.pdf .............................................. 11

Steven Menashi, Acting General Counsel, Department of Education,
Memorandum re: Legal bases for approval and discharge of pending
borrower defense claims, Dec. 14, 2017,
https://int.nyt.com/data/documenthelper/6576-menashi-memo/
e1518a22b8810dd9f9a3/optimized/full.pdf................................. 10, 22

Department of Education, "Biden-Harris Administration Approves $72
Million in Borrower Defense Discharges for over 2,300 Borrowers who
Attended Ashford University," Aug. 30, 2023,
https://www.ed.gov/news/press-releases/biden-harris-administration-
approves-72-million-borrower-defense-discharges-over-2300-
borrowers-who-attended-ashford-university....................................... 14

Department of Education, Dear Colleague Letter GEN-95-08, Jan. 1, 1995,
https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/1995-01-01/gen-95-08-direct-loan-program-schools-will-not-face-greater-potential-liabilities-ffelp-schools ......... 12

Department of Education, Federal Direct PLUS Loan, Application and Master Promissory Note (2008),
https://fsapartners.ed.gov/sites/default/files/attachments/dlbulletins/DLB0814AttachPLUSMPNrevCCRAAFINAL.pdf .......... 13

Department of Education, *FY 2022 Annual Report* (2023),
https://www2.ed.gov/about/reports/annual/2022report/fsa-report.pdf ...................................................................................... 2, 3

Federal Trade Commission, Opinion Letter (Sept. 25, 1999),
https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-opinion-letter-affirms-consumers-rights-under-holder-rule/120510staffletter1999.pdf ........................................................... 12

## Other Authorities

Black's Law Dictionary (6th ed. 1990) .................................................... 20

Black's Law Dictionary (11th ed. 2019) .................................................. 25

H.R. Rep. No. 103-111 (1993) ........................................................... 23, 24

Marco Di Maggio, Ankit Kalda and Vincent Yao, Working Paper, "Second Chance: Life without Student Debt," National Bureau of Economic Research (Mar. 2020),
https://www.nber.org/papers/w25810 .................................................. 28

Scott Fullwiler, et al., Report, "The Macroeconomic Effects of Student Debt Cancellation," Levy Economics Institute of Bard College, Feb. 2018,
https://www.levyinstitute.org/pubs/rpr_2_6.pdf ........................... 28, 29

Thomas LaSalvia, et al., "Resuming Student Loan Payments May
 Exacerbate Affordability Crisis and Pressure Retail Sector," Moody's
 Analytics, July 7, 2023,
 https://cre.moodysanalytics.com/insights/cre-news/resuming-student-
 loan-payments-may-exacerbate-affordability-crisis-and-pressure-
 retail-sector/ ...................................................................................28


Alvaro Mezza, et al., "Student Loans and Homeownership," 38 J. Lab.
 Econ. 215 (2020)...............................................................................28

Pew Charitable Trusts, Issue Brief, "At What Cost? The Impact of
 Student Loan Default on Borrowers," Feb. 16, 2023,
 https://www.pewtrusts.org/en/research-and-analysis/issue-
 briefs/2023/02/at-what-cost-the-impact-of-student-loan-default-on-
 borrowers .........................................................................................27

Project on Predatory Student Lending at the Legal Services Center
 of Harvard Law School, Comment Letter on Proposed Rule (Aug. 2,
 2018),
 https://www.regulations.gov/comment/ED-2018-OPE-0027-0011.....10

Webster's II New Riverside University Dictionary (1994).....................21

## INTEREST OF AMICI CURIAE[1]

Amicus curiae Public Citizen, Inc. is a non-profit advocacy organization with members in all 50 states. Public Citizen appears before Congress, agencies, and courts on a wide range of issues, and works for enactment and enforcement of laws to protect workers, consumers, and the public. Public Citizen submitted comments in the Department of Education's 2022 rulemaking at issue here, and in previous rulemakings regarding the borrower defense statute.

The Project on Predatory Student Lending is a nonprofit organization whose mission is to remove barriers to education, training, and occupation for individuals by representing the legal interests of students against predatory practices in higher education and student lending. The Project has represented over one million students across the country, winning landmark cases to protect borrower rights, recover money owed, and cancel fraudulent debt. The Project submitted

---

[1] All parties have consented to the filing of this brief. The brief was not authored in whole or part by counsel for a party; no party or counsel for a party contributed money that was intended to fund this brief's preparation or submission; and no person other than the amicus curiae, its members, or its counsel contributed money intended to fund the brief's preparation or submission.

comments in the Department of Education's 2022 rulemaking at issue here, and in previous rulemakings regarding the borrower defense statute.

Amici submit this brief to explain the history of the Department of Education's interpretation and application of the borrower defense statute, 20 U.S.C. § 1087e(h), and why the agency's long-standing position that the statute allows the Department to recognize defenses to repayment raised prior to default is consistent with the statute's text, purpose, and history. The brief also explains how the relief sought by Career Colleges & Schools of Texas (CCST) would harm student borrowers and be contrary to the public interest.

## INTRODUCTION

Programs administered pursuant to Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070, *et seq.*, represent the largest stream of federal postsecondary education funding for students. One Title IV program, created in 1993, is the William D. Ford Federal Direct Loan Program (Direct Loan Program), which allows students who attend participating schools to obtain direct loans from the federal government. 20 U.S.C., ch. 28, subch. IV, part D. In 2022 alone, more than $83 billion

in aid was disbursed to students under this program. Dep't of Educ., *FY 2022 Annual Report* 15 (2023), https://www2.ed.gov/about/reports/annual/2022report/fsa-report.pdf.

Through the Higher Education Act, Congress directed the Secretary of Education to ensure that schools receiving Title IV funds meet various eligibility and participation requirements, including requirements related to financial responsibility. *See*, *e.g.*, 20 U.S.C. §§ 1087c, 1087d(a)(6), 1094(c)(1). Congress also authorized the Secretary to levy civil penalties on schools found to have engaged in misrepresentations. *Id.* § 1094(c)(3)(B). At the same time, Congress provided for the federal government to discharge debts incurred from Title IV loans in certain circumstances. For example, borrowers with certain income levels or employment, or who have served in the military, may have their Title IV loan amounts discharged or deferred by the Secretary. *See, e.g.*, *id.* §§ 1098d–f, 1087j, 1087e(f).

This appeal concerns two provisions by which Congress directed the Secretary to discharge borrowers' federal loans based on actions by the Title IV-participating school attended by the student borrower. First, the Secretary shall discharge a loan when a student is "unable to complete

the program in which such student is enrolled due to the closure of the institution." 20 U.S.C. § 1087(c)(1) ("closed school discharges"). Second, when Congress created the Direct Loan Program in 1993, it directed the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part." Student Loan Reform Act of 1993, Pub. L. 103–66, 107 Stat. 351 (codified at 20 U.S.C. § 1087e(h)) (the borrower defense statute)).

Plaintiff-Appellant CCST seeks to delay the effective date of the portions of a 2022 rule issued by the Department of Education implementing these Congressional directives relating to closed-school discharges and borrower defenses. *See* Final Regulations, Institutional Eligibility Under the Higher Education Act of 1965, as Amended, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 87 Fed. Reg. 65904 (Nov. 1, 2022) (2022 Rule). Amici agree with the Department that these provisions are wholly lawful exercises of the Secretary's statutory and constitutional authority. Amici submit this brief to further address one aspect of the challenged rule:

borrowers' ability to seek a determination from the Department that they have a valid "defense to repayment" outside the context of post-default collection proceedings. The Department and CCST refer to this process as "affirmative claims."

Congress has authorized the Secretary to determine when and under what circumstances to recognize "defenses to repayment." And by entertaining "affirmative claims" consistently throughout the past three decades, the Department has done just that. CCST draws a distinction between "affirmative" and "defensive" claims. But both are "defenses *to repayment*" of outstanding federal student loans based on specified acts or omissions of a school. In either scenario, the underlying defense is that which Congress explicitly directed the Department to recognize, and the relief is limited to that which Congress provided: discharge of outstanding Direct Loan debt and a refund of monies already paid to satisfy the relevant loan. The differences are procedural: how and at what point in the life cycle of a student loan the statutory right and remedy may be invoked.

Pursuant to the borrower defense statute, the Department has recognized borrower defenses to repayment raised "affirmatively" pre-

default under every presidential administration since the statute was enacted in 1993. This history contradicts CCST's suggestion that the Department's recognition of affirmative claims in the 2022 Rule is a novel assertion of administrative power. And the agency's longstanding practice is consistent with the text, history, and purpose of the statute. As both the 2022 Rule and the 2019 Rule issued by then-Secretary DeVos explained, the decision to consider borrower defenses raised pre-default is well within the authority Congress granted the Secretary, particularly in light of concerns that limiting the statute to *post*-default defenses would create perverse incentives for default, with especially concerning impacts on military servicemembers and their families. As the Department has recognized in connection with this rulemaking, the current regulatory regime has resulted in many borrowers being wrongfully deprived of the relief to which they are entitled by statute, and the negative consequences that would result from requiring the Department to continue to apply that regime weigh strongly against the equitable relief sought by CCST here.

# ARGUMENT

## I.   Since the statute's enactment, the Department has consistently understood it to authorize "affirmative claims."

The 2022 Rule is the fourth significant rule implementing the borrower defense statute since its enactment. Although many aspects of the borrower defense process varied across the different regulatory regimes, the Department has entertained defenses to repayment raised pre-default under all of them—dating as far back as 1995, when the initial implementing rule went into effect. This "contemporaneous construction of applicable law and subsequent consistent interpretation" by the agency explicitly charged with implementing the statute is entitled to "[p]ersuasive weight." *Chamber of Commerce of United States of Am. v. U.S. Dep't of Labor*, 885 F.3d 360, 381 (5th Cir. 2018) (quoting *Watt v. Alaska*, 451 U.S. 259, 272–73 (1981)); *see also W. Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (looking to the "history and the breadth of the authority that the agency has asserted" to assess whether rule is within statutory authority (cleaned up)). The three decades of history provides strong support for the lawfulness of the 2022 Rule.

### A. Pre-default defenses under the 1994 Rule

In 1994, the Department issued a rule addressing the circumstances in which a borrower "may request that the Secretary exercise his long-standing authority to relieve the borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school." Notice of Proposed Rulemaking, Federal Direct Student Loan Program, 59 Fed. Reg. 42646, 42649 (Aug. 18, 1994). The rule, which remained in effect for more than 20 years, specified that borrowers could assert, "as a defense against repayment, any act or omission of the school attended by the [borrower] that would give rise to a cause of action against the school under applicable State law." Final regulations, William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61664, 61692 (Dec. 1, 1994), *codified at* 34 C.F.R. § 685.206(c)(1) (1994). The regulatory text specified that the defense could be invoked in a range of administrative proceedings, including, *"but [ ] not limited to,"* "[t]ax refund offset proceedings," "[w]age garnishment proceedings," "[s]alary offset proceedings," and "[c]redit bureau reporting proceedings." *Id.* (emphasis added). If the borrower's defense against repayment was "successful," the rule provided that the borrower would be relieved of the

obligation to repay all or part of the loan and could be reimbursed "for amounts paid toward the loan voluntarily." *Id.* (34 C.F.R. § 685.206(c)(2)).

Contrary to CCST's suggestion, Appellant's Br. 40, the Department has *never* taken the position that the 1994 Rule barred consideration of defenses to repayment pre-default. The text of the 1994 Rule did not specify when borrowers could assert the defense to repayment—whether before the loan was in default or only in post-default collection proceedings. But the non-exclusive list of proceedings included in the Rule included non-judicial "proceedings" that can, and frequently do, occur prior to a default. For example, pursuant to long-standing regulations, the Department reports information to credit bureaus prior to default, 34 C.F.R. § 30.35, and thus a "credit bureau reporting proceeding" may occur prior to any default. And over the more than twenty years in which the 1994 Rule was in effect, "the agency's interpretations, contracts, and adjudications confirmed" that "defenses to repayment" could be raised prior to default, and that the Department would "adjudicate affirmative, pre-default applications for borrower defense relief." *Vara v. DeVos*, No. CV 19-12175-LTS, 2020 WL 3489679, at *3 (D. Mass. June 25, 2020).

As the Department noted in 2019, it has entertained and approved affirmative claims "throughout the history of the [1994] borrower defense repayment regulation." Final Rule, Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49788 (Sept. 23, 2019). There are examples of the Department's recognition of pre-default borrower defenses to repayment under every Presidential administration from 1995 through 2017. *See* Project on Predatory Student Lending at the Legal Services Center of Harvard Law School, Comment Letter on Proposed Rule, Exhibits 6–41 (Aug. 2, 2018)[2] (attaching various Department memoranda and opinions dated October 1998, October 2000, February 2001, February 2003, and March 2015); *see also* Steven Menashi, Acting General Counsel, Memorandum re: Legal bases for approval and discharge of pending borrower defense claims, Dec. 14, 2017 (Menashi Memo), at 3 (adopting earlier legal analyses of earlier memoranda approving affirmative claims).[3]

---

[2] https://www.regulations.gov/comment/ED-2018-OPE-0027-0011

[3] https://int.nyt.com/data/documenthelper/6576-menashi-memo/e1518a22b8810dd9f9a3/optimized/full.pdf

The Department explicitly recognized that the 1994 Rule contemplated pre-default borrower defenses while the 1994 Rule was in effect. For instance, in a 2014 letter explaining the borrower defense process under the 1994 Rule, the Secretary advised that "a borrower who is not in default can … assert a claim that the loan is not legally enforceable on the basis of a claim against the school" by "present[ing] the claim to the servicer handling the Direct Loan for the Department." Arne Duncan, Secretary of Educ., Letter to Sen. Elizabeth Warren, Aug. 4, 2014.[4] Indeed, as far back as 1995, the Department explained that the 1994 Rule recognized a "defense against repayment of a Direct Loan" that mimicked the defense to repayment under the predecessor Federal Family Education Loan (FFEL) program. *See* Notice of the results of the first meeting of the Borrower Defenses Regulations Negotiated Rulemaking Advisory Committee; Notice of Interpretation, 60 Fed. Reg. 37668, 37669–79 (Jul. 21, 1995) (1995 Interpretation). *Id.* at 37769–70;

---

[4] https://protectborrowers.org/wp-content/uploads/2023/10/2014.08.04-USED-LTR-to-Senators-re-COCO-1.pdf

*see also* Dep't of Educ., Dear Colleague Letter GEN-95-08, Jan. 1, 1995.[5]

As the 1994 Rule explained, FFEL promissory notes incorporated a version of the FTC's "Holder Rule." *See* 1994 Rule, 59 Fed. Reg. at 61672.[6] Under the Holder Rule, defenses to repayment can be raised by a consumer "affirmatively," not just as "a defense in the nature of a set-off against a creditor claim for payment of the balance due." FTC, Opinion Letter (Sept. 25, 1999) (discussing Holder Rule and interpretations from the early 1990s).[7] The Department never suggested that defenses to repayment as to Direct Loans differed from defenses to repayment as to FFEL loans in this respect. To the contrary, language contained in the Direct Loan Master Promissory Note throughout this time period

---

[5] https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/1995-01-01/gen-95-08-direct-loan-program-schools-will-not-face-greater-potential-liabilities-ffelp-schools

[6] The Holder Rule, 16 C.F.R. § 433.2, requires that sellers include in consumer credit contracts the following notice: "Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder." (formatting modified).

[7] https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-opinion-letter-affirms-consumers-rights-under-holder-rule/120510staffletter1999.pdf

suggested otherwise. Those contracts directed students to contact their loan servicer if they "believe[d] that [they] have a defense against repayment of [their] loan," without suggesting they should wait until default to do so. *E.g.*, Dep't of Educ., Federal Direct PLUS Loan, Application and Master Promissory Note (2008).[8]

### B. Pre-default defenses under the 2016 Rule

The 2015 collapse of Corinthian Colleges and revelations of widespread misconduct by Corinthian led to a surge of borrower defense claims. *See* Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75926, 76047 (Nov. 1, 2016) (2016 Rule). The Department's experience with these claims highlighted difficulties in the application and interpretation of the 1994 Rule and "the lack of clarity" surrounding the procedures that apply to borrower defense. *Id.* The Department therefore amended its borrower defense regulations "to establish a more

---

[8] https://fsapartners.ed.gov/sites/default/files/attachments/dlbulletins/DLB0814AttachPLUSMPNrevCCRAAFINAL.pdf

accessible and consistent borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges." *Id.* at 75926.

In the 2016 Rule, the Department codified its longstanding practice under the 1994 Rule—that borrowers could raise a defense to repayment both before and after default. *See id.* at 75956; 34 C.F.R. § 685.206(c) (2016). Citing interpretations it had issued while the 1994 Rule was in effect, *see supra* pp. 11–12, the Department explained that this aspect of the 2016 Rule was not "an expansion of borrowers' rights," but a continuation of the Department's position since the statute was enacted. 81 Fed. Reg. at 75956–57. The Department has recognized borrower defenses to repayment of some loans covered by the 2016 Rule that were raised affirmatively. *See, e.g.*, Dep't of Educ., "Biden-Harris Administration Approves $72 Million in Borrower Defense Discharges for over 2,300 Borrowers who Attended Ashford University," Aug. 30, 2023.[9]

---

[9] https://www.ed.gov/news/press-releases/biden-harris-administration-approves-72-million-borrower-defense-discharges-over-2300-borrowers-who-attended-ashford-university

### C. Pre-default defenses under the 2019 Rule

In 2019, the Department promulgated a new rule, which sets forth the borrower defense procedures currently in effect as a result of this Court's injunction pending appeal. Although the 2019 Rule made several changes to the procedure by which borrowers could invoke defenses to repayment, it explicitly reaffirmed the Department's position that the statute authorizes the Secretary to recognize defenses to repayment prior to default. 84 Fed. Reg. at 49796. Accordingly, the status quo that CCST seeks to preserve while litigation proceeds includes the very feature that it claims is unlawful.

In the agency's 2018 notice of proposed rulemaking, the Department indicated that it was considering limiting the scenarios in which borrowers could invoke the statutory defense to repayment "to a proceeding to collect on the loan by the Department." Notice of Proposed Rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 83 Fed. Reg. 37242, 32754 (July 31, 2018). After receiving and reviewing comments, the agency reversed course and, in the final rule, "agree[d] that it is appropriate to accept both

affirmative and defensive claims." 2019 Rule, 84 Fed. Reg. at 49796. The

Department explained:

> [A]llowing only defensive claims may provide borrowers with
> an incentive to default, which, in turn, would have negative
> consequences for the borrower. In addition, we are concerned
> about the potential negative impacts on military
> servicemembers, their families, and borrowers, in general,
> which could result from increased instances of loan default
> triggered by borrower efforts to become eligible to assert
> defensive claims.

*Id.*

Notably, the agency explicitly rejected the argument that "the

consideration of affirmative claims is outside of the Department's

statutory authority or the purpose of the borrower defense regulations."

*Id.* The Department clarified that its initial proposal had not been meant

to "imply that [it] does not have the authority to consider affirmative

claims," and that its proposal "clearly indicated that it does have such

authority." *Id.* The Department identified two statutory sources of such

authority. *Id.* First, the agency pointed to its "broad statutory authority

to make, promulgate, issue, rescind, and amend regulations governing

the manner of, operations of, and governing of the applicable programs

administered by the Department and functions of the Department,"

conferred by 20 U.S.C. § 1221e-3. *Id.* Second, the agency explained that

"by providing that the Department may regulate borrowers' assertion of borrower defenses to repayment," the borrower defense statute itself "grants the Department the authority to not only identify borrower causes of action that may be recognized as defenses to repayment, but also to establish the procedures for receipt and adjudication of borrower claims—including the type of proceeding through which the Department may consider such a claim." *Id.*

### D. Pre-default defenses under the 2022 Rule

In July 2022, the Department again proposed to amend the rules governing borrower defenses to repayment. Notice of Proposed Rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 87 Fed. Reg. 41878 (July 13, 2022). The proposed rule, like the 2019 Rule, allowed borrowers to raise defenses to repayment prior to default. *Id.* at 42005 (proposed 34 C.F.R. § 685.401(b)). In November 2022, the Department finalized the challenged rule. 87 Fed. Reg. 65904. The relevant provision was adopted as proposed, specifying that a borrower "with a balance due on a covered loan … will be determined to have a defense to repayment … if, at any

time," the borrower satisfies the promulgated substantive standard. *Id.* at 66068 (promulgating 34 C.F.R. § 685.401(b)).

As Secretary DeVos had in 2019, the Department rejected commenters' arguments that "there is no legal ground in the HEA for affirmative [borrower defense (BD)] claims," noting that the borrower defense statute's language "in no way limits the remedy to a defense asserted in collection proceedings." *Id.* at 65914. It further explained:

> [T]he concept of 'repayment' is widely understood to encompass not just borrowers in default but also those actively repaying their loans. As we note elsewhere, relief, though unique, bears features of remedies like rescission, avoidance, restitution, and certain forms of out-of-pocket or reliance costs. Those remedies are appropriate as a defense to the obligation to repay, not simply as backstops for contingencies like default.... Moreover, limiting BD only to loans in default would be illogical. Only allowing claims from loans in default would place borrowers in an unfair situation of either intentionally defaulting in the hopes that a BD claim is successful or repaying a loan that potentially should be discharged due to the acts or omissions of an institution. Given that institutions must keep their default rates below certain thresholds established in statute and regulations, creating an incentive for default could end up inadvertently hurting an institution that has large numbers of BD claims.

*Id.*

\* \* \*

Thirty years of consistent statutory interpretation, as well as the policy factors relied upon in both the 2019 Rule and the 2022 Rule for declining to restrict the availability of defenses to repayment to post-default proceedings, cuts strongly against CCST's arguments that the 2022 Rule represents an unauthorized usurpation of power. As this Court recently noted, while the Executive Branch's view of its "own authority under a statute is not controlling, … when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is entitled to great respect." *Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022) (quoting *AFL-CIO v. Kahn*, 618 F.2d 784, 790 (D.C. Cir. 1979)); *see also Biden v. Missouri*, 595 U.S. 87, 94 (2022) (per curiam) (looking to "the longstanding practice of [a federal agency] in implementing the relevant statutory authorities" in rejecting claim that agency action exceeded scope of those authorities).

## II.  The statute authorizes pre-default consideration of a borrower's "defenses to repayment."

In addition to being consistent with its longstanding interpretation, the Department's position, reflected in the 2022 Rule (and earlier rules) that the Higher Education Act authorizes pre-default consideration of defenses to repayment is correct. The statute directs the Secretary to

define "which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan." 20 U.S.C § 1087e(h). It contains no language limiting *when* the Secretary may entertain assertions of the defense to repayment, and the Department has never, since the statute was enacted, suggested that it did. To the contrary, the text, history, and purpose of the statute all demonstrate that Congress intended to grant the Secretary the authority to consider defenses to repayment raised *before* default. In doing so repeatedly over the last three decades, the Department has not impermissibly created a private right of action; it has recognized "defenses to repayment" as Congress directed.

### A. "Defenses to repayment" under the statute include defenses raised pre-default.

Nothing about the term "defenses to repayment" suggests the defenses may be raised only in "existing collection proceedings," as CCST suggests. Appellant's Br. 40. According to dictionaries from around the time when the statute was enacted, the term "defense" means a substantive basis to discharge a legal obligation. For example, the 1990 edition of Black's Law Dictionary defined "defense" in the context of a commercial instrument (similar to the promissory notes at issue in this

context) as "a legally recognized basis for avoiding liability either on the instrument itself or on the obligation underlying the instrument." Black's Law Dictionary (6th ed. 1990). Similarly, Webster's dictionary defined "defend" as "[t]o contest (a legal action *or claim*)." Webster's II New Riverside University Dictionary (1994) (emphasis added). Thus, under the ordinary meaning of the statutory text, when a borrower contests liability on a debt owed under her student loan, even if outside the context of a collection proceeding, she is "assert[ing] … a defense to repayment of a loan."

Other provisions of the statute make clear that the term "repayment" does not refer to something that occurs only after default, but rather refers to the ongoing repayment obligation that borrowers face on a monthly basis. *See, e.g.*, 20 U.S.C. § 1087e(b)(9) ("Repayment incentives"); *id.* § 1087e(d) ("Repayment plans"); *id.* § 1087e(e) ("Income contingent repayment"). For example, the statute's provision for loan "[r]epayment plans" identifies five kinds of repayment plans, *id.* § 1087e(d)(1)(A)–(E), as well as "[a]lternative repayment plans" provided on "a case by case basis," *id.* § 1087e(d)(4), all of which can be invoked before a borrower is in default. On the other hand, the statute has a

separate provision governing "[r]epayment after default," *id.* § 1087e(d)(5), demonstrating that Congress knows how to limit a provision's applicability to loans in default when it wants to do so. Congress could have similarly qualified the phrase "defense to repayment" to refer to "repayment after default," in section 1087e(h), or it could have specified provided for a defense to "a collections proceeding." It did neither. As the Department's Acting General Counsel explained in 2017, "[t]he only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan." Menashi Memo at 6.

The history and purpose of the statute support the text's plain meaning. The year before Congress enacted the borrower defense provision, it used the phrase "defense[] against repayment" in the Higher Education Amendments of 1992. There, Congress directed the Secretary to conduct a "[s]tudy of the impact of fraud-based defenses on the Federal Family Education Loan Program." Higher Education Amendments of 1992, Pub. L. 102–325, § 1403(a), 106 Stat. 817. That study was to include, among other things:

> (1) an analysis of statutory, regulatory, and case law regarding the use of fraud-based *defenses against repayment*

> of such loans; (2) an estimate of the total number of borrowers filing for relief from repayment of such loans using a fraud-based defense and amount of such loan principal involved; (3) an estimate of such loan principal relieved annually through fraud-based defenses.

*Id.* (emphasis added). The phrase "borrowers filing for relief from repayment … using a fraud-based defense" necessarily contemplates the borrower's assertion of the defense in "affirmative" claims, because the borrower's "filing for relief" is an affirmative invocation by the borrower of the defense. *Id.* § 1403(a)(2).

When Congress enacted the borrower defense provision the following year in the Student Loan Reform Act of 1993, it employed a near-identical phrase, requiring the Secretary to establish regulations providing for "defense[s] to repayment." 20 U.S.C. § 1087e(h). Because "Congress is presumed to have acted against a background of shared understanding of the terms it uses in statutes," *Chamber of Commerce of United States of Am.*, 885 F.3d at 373, Congress's use of the phrase "defense to repayment" incorporates the same meaning as the analogous phrase in the Higher Education Act Amendments, which encompassed assertions of the defense outside the default context.

In addition, recognizing claims pre-default is consistent with Congress's purpose in enacting the statute— making "loan repayment … less burdensome" and thereby "encourag[ing] students to seek postsecondary education." H.R. Rep. No. 103-111, at 107 (1993). Congress intended to provide borrowers with "flexibility in managing their student loan repayment obligations," *id.* at 112, including by providing repayment plans that "would likely discourage defaults," *id.* at 107. As the Department explained in 2019 and in 2022, restricting the borrower defense to post-default collection proceedings would run contrary to this purpose by incentivizing borrowers to default on their loans so as to trigger the availability of the defense, resulting in "negative consequences for the borrower." 2019 Rule, 84 Fed. Reg. at 49796; 2022 Rule, 87 Fed. Reg. at 65914.

Moreover, the Department's authority is confirmed by Congress's directive that Direct Loan program loans shall "have the same terms, conditions, and benefits" as FFEL loans. 20 U.S.C. § 1087a(b)(2); *see also* H.R. Rep. No. 103-111, at 119; 81 Fed. Reg. 75926, 75956 (citing 60 Fed. Reg. 37768, 37769–70). As discussed above, at 12, at the time the statute was enacted, the FFEL program incorporated the FTC Holder Rule, and

its recognition that defenses to repayment can be raised affirmatively. Congress was presumably aware of this feature of the FFEL program when it created the Direct Loan program. *See, e.g.*, *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) ("[W]e presume that Congress is aware of existing law when it passes legislation." (cleaned up)). Yet Congress said nothing to indicate that the defenses to repayment under the Direct Loan Program should *differ* from the FFEL program.

### B. Pre-default defenses to repayment of outstanding loans are not private rights of action.

The invocation of defenses to repayment of a loan pre-default or post-default is not the same as an assertion of a private right of action. A "private right of action" is "an individual's right to sue in a personal capacity to enforce a legal claim." Black's Law Dictionary (11th ed. 2019). Neither the 2022 Rule, nor any prior rule, provides individuals with a right to sue to compel discharge of a federal student loan.

This case is thus distinguishable from *Chamber of Commerce v. Department of Labor*, 885 F.3d 360. In that case, this Court held that an agency had impermissibly "create[d] vehicles for private lawsuits" without congressional authorization. *Id.* at 384. The Court observed that

"[o]nly Congress may create privately enforceable rights, and agencies are empowered only to enforce the rights Congress creates." *Id*. Here, the Department has not created any vehicle for private lawsuits, and the only borrower "right" implicated is the congressionally created right to be excused from repayment of Direct Loans in certain circumstances. That same right may be vindicated via both "defensive" and "affirmative" claims. Likewise, the relief that the Department can award, for either defensive or affirmative claims, is that which Congress explicitly prescribed: discharge of outstanding loans and, potentially, a refund of amounts previously paid on the loans. As the Department explained in 2019, the decision to consider defenses at different parts in the life cycle of a Direct Loan is an exercise of the congressionally delegated authority "to establish the procedures for receipt and adjudication of borrower claims." 2019 Rule, 84 Fed. Reg. at 49796.

## III.  The equities weigh against a preliminary injunction.

The purpose of a preliminary injunction is "to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017). Here, the equities weigh against an injunction: The harms to student borrowers would be contrary to the

public interest, and the recognition of borrower defenses to repayment does not cause a direct harm to CCST's members.

In determining whether to issue "a preliminary injunction, a court must … 'consider the overall public interest.'" *Id.* (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 26 (2008)). The continued use of the procedures specified in the 2019 Rule would be contrary to the public interest because, as the Department explained, "too many borrowers who were subjected to an act or omission by their institution that should give rise to a successful defense to repayment have not received appropriate relief, at least in part because the [currently in-effect] regulatory requirements have created unnecessary or unfair burdens for borrowers." 2022 Rule, 87 Fed. Reg. at 65908; *see also id.* at 65910, 65079.

The deprivation of the statutorily prescribed defense to repayment would have significant consequences for both borrowers who default on their loans, and those who make timely loan payments. The consequences of default include ineligibility to receive more federal financial aid, negative impacts on other credit, collection fees, and losses of professional licenses. *See* Pew Charitable Trusts, Issue Brief, "At What Cost? The

Impact of Student Loan Default on Borrowers," Feb. 16, 2023;[10] *see also* 2022 Rule, 87 Fed. Reg. at 65979 (identifying some potential consequences of default); 2016 Rule, 81 Fed. Reg. at 76051 (describing negative consequences of default). Borrowers who continue to make payments on loans for which Congress specified they would not be responsible will also suffer negative consequences as they struggle to pay those loans. *See, e.g.*, Alvaro Mezza, et al., "Student Loans and Homeownership," 38 J. Lab. Econ. 215 (2020). Additionally, the discharge of loans for which borrowers have valid borrower defenses would have what the Department has previously recognized as "spillover economic benefits" on the greater economy. 2016 Rule, 81 Fed. Reg. at 76051; *see also* Thomas LaSalvia, et al., "Resuming Student Loan Payments May Exacerbate Affordability Crisis and Pressure Retail Sector," Moody's Analytics, July 7, 2023[11]; Marco Di Maggio, Ankit Kalda and Vincent Yao,

---

[10] https://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2023/02/at-what-cost-the-impact-of-student-loan-default-on-borrowers

[11] https://cre.moodysanalytics.com/insights/cre-news/resuming-student-loan-payments-may-exacerbate-affordability-crisis-and-pressure-retail-sector/

Working Paper, "Second Chance: Life without Student Debt," Nat'l Bureau of Econ. Res. (Mar. 2020) (analyzing spillover benefits associated with loan cancellation)[12]; Scott Fullwiler, et al., Report, "The Macroeconomic Effects of Student Debt Cancellation," Levy Economics Institute of Bard College, Feb. 2018 (concluding debt cancellation reduces average unemployment rate, boosts real GDP, and creates jobs).[13] For these reasons, preliminarily enjoining the Department from applying the 2022 provisions regarding defenses to repayment would be contrary to the public interest.

Further, the 2022 Rule's procedures for recognizing defenses to repayment do not directly cause an injury to CCST or its members. As the Department explained in the 2022 Rule, "the loan discharge process is between the borrower and the Secretary" and "is separate from any recoupment proceeding that the Secretary elects to pursue against an institution." 87 Fed. Reg. at 65913. Loan discharge and recoupment are governed by different standards, and one does not automatically follow

---

[12] https://www.nber.org/papers/w25810

[13] https://www.levyinstitute.org/pubs/rpr_2_6.pdf

from the other.[14] Further, unlike the loan discharge procedures contained in the 2022 Rule, recoupment proceedings under the 2022 Rule will "only be undertaken prospectively, with respect to loans disbursed after July 1, 2023." *Id.* at 65913. Given the time lag between loan disbursement and any invocation of and processing of a borrower defense, which necessarily precede any recoupment proceeding, any such proceedings are highly unlikely during the pendency of this litigation.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's denial of a preliminary injunction.

---

[14] Indeed, the recoupment regulations, 34 C.F.R. § 685.409, are severable from the loan discharge regulations, 34 C.F.R. § 685.212, per 34 C.F.R. § 685.109.

Respectfully submitted,

/s/ Adam R. Pulver
Adam R. Pulver
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
Apulver@citizen.org

Rebecca Eisenbrey
Project on Predatory Student Lending
769 Centre Street, Ste 166
Jamaica Plain, MA 02130
(617) 322-2808

Counsel for Amici Curiae

October 10, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2023, the foregoing brief has been served through this Court's electronic filing system upon counsel for the parties.

/s/ Adam R. Pulver
Adam R. Pulver
*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and the Rules of this Court, it contains 5,584 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Century Schoolbook.

October 10, 2023                    /s/ Adam R. Pulver
                                     Adam R. Pulver
                                     *Counsel for Amici Curiae*