Case No. 23-50491

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CAREER COLLEGES AND SCHOOLS OF TEXAS,

*Plaintiff-Appellant*,

*v.*

UNITED STATES DEPARTMENT OF EDUCATION;
MIGUEL CARDONA, SECRETARY, U.S. DEPARTMENT OF EDUCATION,
IN HIS OFFICIAL CAPACITY AS THE SECRETARY OF EDUCATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

**BRIEF OF MASSACHUSETTS, CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA,
HAWAI'I, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA,
NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK,
NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND,
VERMONT, WASHINGTON, AND WISCONSIN AS *AMICI CURIAE* IN
SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
Elizabeth N. Dewar
  *State Solicitor*
Yael Shavit
Michael N. Turi
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2204
bessie.dewar@mass.gov

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES**

Pursuant to Fifth Circuit Rule 28.2, the undersigned counsel certifies the following governmental entities have joined this *amicus curiae* brief, represented by the following list of counsel. These representations are made so the judges of this court may evaluate potential disqualification or recusal.

*Amici curiae* on this brief:

| | | |
|---|---|---|
| Massachusetts | Maine | North Carolina |
| California | Maryland | Oregon |
| Colorado | Michigan | Pennsylvania |
| Connecticut | Minnesota | Rhode Island |
| Delaware | Nevada | Vermont |
| The District of Columbia | New Jersey | Washington |
| Hawai'i | New Mexico | Wisconsin |
| Illinois | New York | |

Counsel for *Amici curiae* on this brief:

Andrea Joy Campbell, Attorney General of Massachusetts
Elizabeth N. Dewar, State Solicitor, Massachusetts
Yael Shavit, Assistant Attorney General, Massachusetts
Michael N. Turi, Assistant Attorney General, Massachusetts
Rob Bonta, Attorney General of California
Philip J. Weiser, Attorney General of Colorado
William Tong, Attorney General of Connecticut
Kathleen Jennings, Attorney General of Delaware
Brian L. Schwalb, Attorney General for the District of Columbia
Anne E. Lopez, Attorney General of Hawaii
Kwame Raoul, Attorney General of Illinois
Aaron M. Frey, Attorney General of Maine
Anthony G. Brown, Attorney General of Maryland
Dana Nessel, Attorney General of Michigan
Keith Ellison, Attorney General of Minnesota
Aaron D. Ford, Attorney General of Nevada

i

Matthew J. Platkin, Attorney General of New Jersey
Raúl Torrez, Attorney General of New Mexico
Letitia James, Attorney General of New York
Joshua H. Stein, Attorney General of North Carolina
Ellen F. Rosenblum, Attorney General of Oregon
Michelle A. Henry, Attorney General of Pennsylvania
Peter F. Neronha, Attorney General of Rhode Island
Charity R. Clark, Attorney General of Vermont
Robert W. Ferguson, Attorney General of Washington
Joshua L. Kaul, Attorney General of Wisconsin

/s/ Elizabeth N. Dewar
Elizabeth N. Dewar
Counsel for *Amici Curiae*

**TABLE OF CONTENTS**

INTERESTS OF AMICI .......................................................................... 1

ARGUMENT ........................................................................................... 7

I.  Adjudication of Affirmative Borrower Defense Claims Is Both Legally
    Permissible and Practically Necessary. ........................................... 7

    A.  The Plain Text of the Higher Education Act Empowers the
        Department to Consider Affirmative Applications for Borrower
        Defense Relief. ............................................................................ 8

    B.  The Department Has Consistently Interpreted the Act as Permitting
        Borrowers to Raise Affirmative Borrower Defense Claims. .................. 10

    C.  Limiting Eligible Borrowers to Filing Only "Defensive" Claims, in
        a Post-Default Posture, Would Produce Untenable Outcomes and
        Defeat the Purpose of the Act ................................................. 13

II. The Borrower Defense Rule's Group Discharge Process Is Essential for
    Addressing Systemic Institutional Misconduct. ................................ 16

    A.  The States' Experience Uncovering Systemic Misconduct by
        Schools Affecting Entire Cohorts of Students Demonstrates the
        Propriety and Importance of a Group Claims Process. .......................... 18

    B.  Eliminating the Group Discharge Process Would Waste Taxpayer
        Resources and Deprive Eligible Borrowers of Relief. ........................... 22

CONCLUSION ..................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Matter of Thomas*,
   931 F.3d 449 (5th Cir. 2019) ................................................................. 9

*United States v. Hildenbrand*,
   527 F.3d 466 (5th Cir. 2008) ................................................................. 9

*Vara v. DeVos*,
   2020 WL 3489679 (D. Mass. June 25, 2020) ................................. 12-13

*Williams v. DeVos*,
   2018 WL 5281741 (D. Mass. Oct. 24, 2018) ................................. 20-21

**Statutes**

Higher Education Act of 1965,
   20 U.S.C. §§ 1001 *et seq*. (1965) ......................................................... 2
   § 1087e(h) ................................................................................... *passim*

26 U.S.C. § 6402(d) ................................................................................ 14

31 U.S.C. § 3716 ..................................................................................... 15

31 U.S.C. § 3720A .............................................................................. 14-15

**Regulations**

31 C.F.R. § 285.2 .................................................................................... 15

34 C.F.R. § 685.401(a) .............................................................................. 3

34 C.F.R. § 685.401(b)(5)(i) ..................................................................... 3

34 C.F.R. § 685.402 ....................................................................... 16

34 C.F.R. § 685.402(c)..................................................................... 3

34 C.F.R. § 685.406(b)(2) .............................................................. 16

60 Fed. Reg. 37,768 (July 21, 1995)...........................................10-11

81 Fed. Reg. 75,926 (Nov. 1, 2016)............................................... 11

84 Fed. Reg. 49,788 (Sept. 23, 2019) .....................................11-12, 15-16

87 Fed. Reg. 41,878 (July 13, 2022).................................3, 16, 17, 18-19

87 Fed. Reg. 65,904 (Nov. 1, 2022)............................... 2, 3, 4, 19, 21

**Miscellaneous**

AARP, Student Loan Debt Can Sink Your Retirement Plan (Sept. 18, 2018)....... 15

Application for Borrower Defense on Behalf of Borrowers that Attended
   Schools Operated by Education Corporation of America (Apr. 28, 2022) ......... 21

Assurance of Discontinuance, *In the Matter of Argosy University*, Minnesota
   Attorney General's Office (Jan. 26, 2022).......................................... 17

Assurance of Discontinuance, *In the Matter of Kaplan, Inc., Kaplan Higher
   Education, LLC*, 1584CV02218 (Mass. Sup. Ct. July 23, 2015) ...................... 17

Assurance of Voluntary Compliance, *Commonwealth of Pennsylvania v.
   Elevation Capital Partners, LLC*, GD-21-003357 (Pa. Com. Pl.
   Apr. 6, 2021) .................................................................... 17

*Black's Law Dictionary* (11th ed. 2019).................................................... 9

Complaint, *Commonwealth of Kentucky v. National College of Kentucky
   Inc.*, No. 11-CI-04922 (Ky. Cir. Ct. Sept. 27, 2011) ......................... 17

Complaint, *People of the State of Illinois v. Westwood College, Inc. et al.*,
No. 12-CH-01587 (Ill. Cir. Ct. Jan. 18, 2012) ..................................... 17

Consent Judgment, *Commonwealth of Massachusetts v. Lincoln Technical
Institute, Inc. et al.*, 1584CV02044 (Mass. Sup. Ct. July 15, 2015) .................. 17

Senator Dick Durbin, *Question 6.4: Submissions by Attorneys General Seeking
Relief for Constituents* (last accessed October 10, 2023).................................... 21

Final Judgment, *Commonwealth of Massachusetts v. Premier Education
Group L.P., Salter College: A Private Two-Year College, LLC,*
2014CV3854 (Mass. Sup. Ct. Dec. 11, 2014) ..................................... 17

Final Judgment, *Commonwealth of Massachusetts v. The Career Institute,
LLC et al.,* 2013CV4128 (Mass. Sup. Ct. June 1, 2016) ................................... 17

Final Judgment, *People of the State of California v. Corinthian
Colleges, Inc.*, No. CGC-13-534793 (Cal. Sup. Ct. Oct. 10, 2013) .................. 17

Findings of Fact, Conclusions of Law and Order, *Minnesota v. Minnesota
School of Business et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct.
Sept. 8, 2016) ............................................................................................ 17

Chairman Tom Harkin, "Benefitting Whom? For-Profit Education Companies
and the Growth of Military Educational Benefits" *U.S. Senate, Health,
Education, Labor and Pensions Committee* (Dec. 8, 2010) .............................. 15

National Security Adjudicative Guidelines, *Security Executive Agent
Directive 4*, Office of the Director of National Intelligence (June 8, 2017)....... 15

Pew Charitable Trusts, *Student Loan Default Has Serious Financial
Consequences* (Apr. 2020) ................................................................................ 14

Press Release, *A.G. Schneiderman Announces Restitution for Hundreds
of Students Duped by Devry University*, New York State Attorney
General's Office (Aug. 17, 2017) ...................................................................... 17

Press Release, *Career Education Corporation to Stop Collecting on Loans, Changes Practices in Agreement with Maryland, 48 Other Attorneys General*, Maryland Attorney General's Office (Jan. 3, 2019) ............................ 17

Press Release, *Madigan Announces Settlements with For-Profit Education Management Corporation*, Illinois Attorney General's Office (Nov. 16, 2015) ................................................................................. 17

Judith Scott-Clayton, *What Accounts for Gaps in Student Loan Default, and What Happens After*, The Brookings Institution (June 21, 2018) ............... 14

State of Colorado et al., *Application for Borrower Defense on Behalf of ITT Students* (Apr. 1, 2021) ............................................................. 19

Statement of Decision, *People of the State of California v. Ashford University, LLC*, No. 27-2018-0046134 (Cal. Sup. Ct. Mar. 3, 2022) ............... 17

U.S. Dep't of Educ., *Borrower Defense Loan Discharge*, Office of Fed. Student Aid................................................................................... 2

U.S. Dep't of Educ., *Report on Borrower Defense*, Federal Student Aid Enforcement Office (Oct. 28, 2016) ................................................. 23

U.S. Dep't of Educ., *Student Loan Repayment*, Office of Fed. Student Aid........... 9

U.S. Dep't of Treas., *What is the Treasury Offset Program?*, Bureau of the Fiscal Service (last modified July 14, 2023)................................. 14

**INTERESTS OF AMICI**

*Amici* States—Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin—have compelling interests in protecting our residents from fraud and deception. To that end, States have taken a leading role in addressing misconduct perpetrated by postsecondary institutions, regularly initiating investigations and enforcement actions against predatory schools under our consumer protection laws. These investigations have revealed that dozens of schools—particularly private, for-profit entities—have engaged in pervasive unfair and deceptive practices, and systematically victimized thousands of student borrowers in the process.

The regulations challenged in this litigation are critical for ensuring that students who experience such institutional abuse are not unfairly saddled with federal student debt. To achieve this end, Congress directed the Department of Education ("Department") to create a "borrower defense" process—a statutory entitlement to loan relief for borrowers who are defrauded by their schools. *See* 20 U.S.C. § 1087e(h). *Amici* States have assisted hundreds of thousands of student borrowers with securing relief under this process by, among other measures, submitting claims on behalf of groups of similarly situated students who were

1

subjected to systemic institutional misconduct.

In essence, borrower defense "is a legal ground for discharging federal Direct Loans" where a student's "school engaged in certain misconduct related to the making of a federal loan or the educational services it provided." Office of Federal Student Aid, *Borrower Defense Loan Discharge*, U.S. Dep't of Educ., https://tinyurl.com/mw472eur (last visited Oct. 10, 2023). Congress established this form of relief in 1994 amendments to the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1001 *et seq.*, expressly allowing borrowers to seek discharge of their federal student loans on the basis of a school's malfeasance. Congress instructed the Department to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment," 20 U.S.C. § 1087e(h), and the Department has repeatedly enacted such regulations—starting with the first rule in 1995 and most recently with the 2022 rule at issue here ("the Borrower Defense Rule" or "Rule"). The Borrower Defense Rule sets forth a process by which borrowers who suffered from institutional misconduct may seek and obtain debt relief, grounds for which may include, *inter alia*, substantial misrepresentations, deceptive recruitment practices, and breach of contract by their school. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022).

*Amici* States have important interests in the enforcement of the Borrower Defense Rule. The Rule's borrower defense adjudication procedures can effectuate

relief for borrowers where enforcement actions and investigations by state attorneys general have revealed wrongdoing by schools. The Rule provides that borrowers may be entitled to a borrower defense discharge where "a governmental agency has obtained against the institution a favorable judgment based on State or Federal Law[.]" 34 C.F.R. § 685.401(b)(5)(i); *see* 87 Fed. Reg. 66,068-69. Additionally, the Rule establishes a formal process by which "State Requestors," which include state attorneys general and other state actors, can submit group borrower defense applications on behalf of borrowers in their States. 34 C.F.R. §§ 685.401(a), 685.402(c); *see* 87 Fed. Reg. 66,068-70.

The Rule's procedures recognize and enhance the critical partnership between the States and the Department that furthers the enforcement of state consumer protection laws. As the Department noted in its Notice of Proposed Rulemaking, the Department "has existing collaborative oversight responsibilities with States as both are members of the regulatory triad" of institutional oversight. 87 Fed. Reg. 41,878, 41,965 (July 13, 2022). While the States commit significant time and resources to investigating and bringing enforcement actions against predatory institutions, the States cannot alone relieve students of the burden of federal student loan debt procured as a result of institutional misconduct. The Department's borrower defense process is thus essential for ensuring that state residents harmed by such institutions do not suffer continuing financial harms.

3

Indeed, States' ability to submit group applications on behalf of borrowers on an affirmative basis is often the only way that States can secure meaningful relief for their residents. To obtain such relief, between 2015 and 2021, a total of 29 states submitted group borrower defense claims to the Department for consideration. *See* 87 Fed. Reg. 66,030 (Nov. 1, 2022).

By facilitating an effective remedy for violations of state consumer protection law—loan forgiveness—the Rule greatly enhances the impact of state enforcement efforts for consumers who have suffered harm. And by creating a streamlined process by which state actors may seek relief for their residents, the Rule serves to facilitate the States' interest in protecting their residents from the consequences of institutional misconduct. *Amici* States thus have a compelling interest in ensuring that the Borrower Defense Rule is upheld and fully implemented.

## SUMMARY OF THE ARGUMENT

In rejecting the motion by Career Colleges and Schools of Texas ("CCST") for a preliminary injunction, the District Court correctly concluded that CCST failed to demonstrate a likelihood of irreparable harm. CCST's arguments also fail on the merits, because the Borrower Defense Rule is both lawfully enacted and rationally explained. *Amici* States submit that CCST's arguments seeking to vacate the Rule miss the mark for at least two principal reasons.

4

First, CCST's argument that the Department of Education may not consider any claims for borrower defense relief unless a borrower has already defaulted on their student debt has no basis in the text of the operative statute. Appellant's Br. 39-41. CCST assumes without justification that the usage of "defense to repayment" in the HEA means that borrowers must be in a post-default posture to seek relief, but CCST's interpretation of the terms "defense" and "repayment" is inconsistent with both the plain meaning of these terms and the terms' consistently accepted usage in the context of the student loan system.

Moreover, the notion that borrowers eligible for relief must first stop paying their loans and senselessly default is not only untethered from the text of the HEA, but would also produce deeply damaging results. Default, as discussed further below, is not a mere procedural posture—it is likely to cause profound harm to affected borrowers, their families, and the economy at large. When a borrower defaults on student debt, that borrower can face housing and employment insecurity for years, lose access to professional licenses, and face seizure of Child Tax Credit and Social Security benefits. Active duty servicemembers and veterans confront more severe harm still, where student loan default may disqualify them from security clearances and thus permanently derail their careers. CCST's interpretation would *mandate* that defrauded borrowers endure these injuries where the text of the operative statute simply does not require it.

5

Second, there is likewise no merit to CCST's challenge to the Rule's group claims process, which permits States to request borrower defense relief for similarly situated cohorts of borrowers affected by institutional misconduct. CCST argues that the Rule's rebuttable presumption in favor of discharge for all members of an affected group is "unreasonable." Appellant's Br. 51. To the contrary, the extensive work of the States in this area demonstrates that the rationale behind the group process is both reasonable and indeed necessary to ensure relief reaches affected borrowers. In the past several years, *Amici* States have commenced dozens of investigations into predatory institutions. These efforts have revealed that offending schools often commit abuse and deception not on a student-by-student basis, but instead in systemic ways that affect entire cohorts, going to the heart of the educational experience. Large bipartisan groups of State Attorneys General have submitted such group discharge requests to the Department in the wake of the well documented misconduct of schools like Corinthian Colleges and ITT Technical Institute. Contrary to CCST's suggestion that a school's misrepresentations will often be "picayune" and not affect large groups of students, these applications have proved otherwise through hundreds of pages of documentary evidence featuring robust statistical findings, extensive legal analyses, and expert economic reports. And in any event, the Department is not *obligated* to grant group applications that fail to prove cohort-wide harm.

6

Dispensing with the availability of group claims, as CCST seeks to do, would also be profoundly inefficient and waste taxpayer resources. The Department would need to commit significant time and effort to adjudicate potentially thousands of individual applications in cases where the evidence has already demonstrated that a school's fraudulent conduct was pervasive. And student borrowers themselves would be further harmed. State and Federal efforts to reach defrauded borrowers have revealed that most are wholly unaware of their entitlement to relief. Accordingly, without the availability of the group claims process, some of the most egregiously harmed borrowers will fail to realize any of the relief to which they are entitled under the Rule and the HEA.

In sum, the challenged Rule was promulgated within the Department's authority as conferred by Congress, is not arbitrary and capricious, and should be upheld in full. *Amici* States respectfully request that the order of the District Court be affirmed.

## ARGUMENT

### I.    Adjudication of Affirmative Borrower Defense Claims Is Both Legally Permissible and Practically Necessary.

The Higher Education Act requires the Department of Education to "specify in regulations" what "acts or omissions" by an institution may give rise to a "defense to repayment" of a borrower's federal student loans. 20 U.S.C. § 1087e(h). The Borrower Defense Rule gives effect to this mandate by

articulating both the substantive standards borrowers must meet to qualify for a defense to repayment and the process by which such claims may be raised. As relevant here, the Rule expressly permits borrowers to raise borrower defense claims based on a school's misconduct regardless of whether the borrower is in default on their loans or still actively in repayment.

For the reasons discussed *infra*, the Borrower Defense Rule is faithful to the text of the operative statute. The Department is authorized to adjudicate claims affirmatively submitted by borrowers actively in repayment, as every Secretary of Education tasked with the question has concluded since 20 U.S.C. § 1087e(h) was enacted in 1994. Were this Court to hold otherwise, borrowers with meritorious claims would be forced to default before seeking statutorily authorized relief, a result that would grievously injure borrowers, harm families with children, and disrupt the economy.

### A.    The Plain Text of the Higher Education Act Empowers the Department to Consider Affirmative Applications for Borrower Defense Relief.

CCST's core challenge to the Department's authority to promulgate the Borrower Defense Rule rests on its assertion that the HEA's use of the term "defense to repayment" categorically prohibits affirmative claims, and that borrowers may raise a defense to repayment *only* after they have defaulted on their student debt. Appellant's Br. 39-41. This argument is premised on an atextual

interpretation of the term "defense to repayment"—based on CCST's own view that the word "defense" is self-limiting—that both ignores the generally accepted meanings of "defense" and "repayment" and defies common sense.

To begin with, no such limitation exists in the text of 20 U.S.C. § 1087e(h). The statute uses the word "defense," which merely means "a basis for avoiding liability on a negotiable instrument." *Defense*, Black's Law Dictionary (11th ed. 2019); *see United States v. Hildenbrand*, 527 F.3d 466, 476 (5th Cir. 2008) (dictionary definition suffices to determine ordinary meaning "[a]bsent a statutory definition"). In other words, the statutory term "defense" does not itself inherently impose a procedural limitation on when and how such a "basis for avoiding liability" must be presented. Moreover, this defense is to "repayment," expressly contemplating that such a defense may be raised prior to default; student loan "repayment" is, of course, generally expected to occur outside of a default posture. *See* Office of Fed. Student Aid, *Student Loan Repayment*, U.S. Dep't of Educ., https://tinyurl.com/28uc8ftf (last visited Oct. 2, 2023) (explaining that federal student loans go into repayment once a borrower graduates or drops below half-time enrollment). Indeed, as this Court has previously recognized, the liability for "repayment" of student debt exists as long as payment is due and owing, not just in post-default proceedings. *See Matter of Thomas*, 931 F.3d 449, 450 (5th Cir. 2019) (defining "repayment" as the period during which a debtor has an obligation to

9

begin repaying student loan debt). Thus, under the plain text of the Act, the liability to be avoided through the "defense to repayment" process is the *continued obligation to repay* the debt—not just the avoidance of the consequences of default.

CCST's contrary interpretation simply defies common sense. In effect, CCST asks this Court to read into the statute a further proviso: a "defense to repayment" for borrowers based on schools' misconduct—but only if those borrowers are already in default. No such requirement exists in the statute. Nor is any reason apparent why Congress would wish to force defrauded borrowers to default before they could be eligible for relief.

### B.    The Department Has Consistently Interpreted the Act as Permitting Borrowers to Raise Affirmative Borrower Defense Claims.

Contrary to CCST's illogical interpretation, the Department has for decades understood the term "defense to repayment" as permitting borrower defense relief when a school's misconduct warrants such relief under the statute, regardless of whether any particular applicant has ceased repaying loans and fallen into default.

This interpretation of "defense to repayment" has been consistent since the Department's very first regulations implementing the statute. In 1995, following the enactment of 20 U.S.C. § 1087e(h) the year prior, the Department explained that its initial borrower defense regulations were intended to mimic the relief

10

already available under the Family Federal Education Loan Program. *See* 60 Fed. Reg. 37,768-70 (July 21, 1995). That program had "allowed borrowers to assert both claims *and* defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings." 81 Fed. Reg. 75,956 (Nov. 1, 2016). The Department repeatedly reaffirmed this broad understanding across multiple administrations, including during rulemaking processes in both 2016 and 2019. *See* 84 Fed. Reg. 49,788, 49,796 (Sept. 23, 2019) ("throughout the history of the existing borrower defense repayment regulation, [the Department] has approved . . . affirmative borrower defense to repayment requests"); 81 Fed. Reg. 75,926, 75,956 ("the Direct Loan borrower defense regulations were intended to . . . allow[ ] borrowers to assert both claims and defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings").

Indeed, in the Department's 2019 rulemaking process under Secretary DeVos, the agency expressed strong disagreement with commenters who argued that "consideration of affirmative claims is outside of the Department's statutory authority or the purpose of the borrower defense regulations." 84 Fed. Reg. 49,796. In light of its "broad statutory authority to make, promulgate, issue, rescind, and amend regulations governing the manner of, operations of, and governing of the

11

applicable programs administered by the Department," *id.*, the Department

reasoned that:

> [B]y providing that the Department may regulate borrowers' assertion of borrower defenses to repayment, section 455(h) of the HEA [20 U.S.C. § 1087e(h)] grants the Department the authority to not only identify borrower causes of action that may be recognized as defenses to repayment, but also to establish the procedures for receipt and adjudication of borrower claims—including the type of proceeding through which the Department may consider such a claim.

84 Fed. Reg. 49,796.

This understanding of the meaning of "defense to repayment" is also

consistent with the Department's historical practices under the statute. In

considering the first affirmative claims for borrower defense relief, the Department

"used mandatory language to describe its consideration of the borrowers' claim,"

stating that it "'*will* . . . recognize such claims'" if the borrowers submitting them

establish eligibility under the regulatory criteria. *Vara v. DeVos*, No. CV 19-

12175-LTS, 2020 WL 3489679, at *5 (D. Mass. June 25, 2020) (quoting

contemporaneous agency memorandum with added emphasis and citing 2003

application on behalf of 58 students and parents, adjudicated and approved on basis

of school's violation of North Dakota law). The Department continued to

adjudicate affirmative applications thereafter, including the approval in 2017 of an

application on behalf of Massachusetts borrowers who were defrauded by

American Career Institute. *Id.* (describing same). In fact, given the uniformity of

its practice over time, the Department has been *required* to adjudicate such applications affirmatively, where failing to do so would have been arbitrary and capricious because it would have conflicted with the Department's longstanding interpretation of 20 U.S.C. § 1087e(h). *See id.* at *6 (finding that "the texts of the HEA and the 1995 borrower defense regulation, as well as Education's contemporaneous interpretations, contracts, and adjudicatory practices, demonstrate that the agency must adjudicate affirmative applications for borrower defense relief through the issuance of reasoned decisions").

In sum, every Secretary of Education to consider this question has concluded that consideration of borrowers' affirmative claims is authorized by the plain text of the HEA. Contrary to CCST's argument, the statute does not impose—and the Department has never implemented—a requirement that borrowers default in order to gain access to relief warranted by schools' misconduct.

C.     **Limiting Eligible Borrowers to Filing Only "Defensive" Claims, in a Post-Default Posture, Would Produce Untenable Outcomes and Defeat the Purpose of the Act.**

CCST's suggestion that the Higher Education Act *requires* that eligible student borrowers must become delinquent on their loans and fall into default before asserting a claim for relief, Appellant's Br. 40-41, is not only atextual but also unworkable.

13

Under CCST's account of the statute, borrowers who are entitled to relief would be forced into the untenable choice of either continuing to repay loans founded upon institutional fraud or defaulting on those loans in order to submit a borrower defense claim. And borrowers who defaulted would consequently suffer from loss of access to credit for years, which can lead to housing and employment insecurity. *See* Pew Charitable Trusts, *Student Loan Default Has Serious Financial Consequences* (Apr. 2020), https://tinyurl.com/5n6fbhdm. Defaulted borrowers could thus struggle to "even to rent an apartment," face "revocation of professional licenses," and encounter difficulty finding and keeping a job. Judith Scott-Clayton, *What Accounts for Gaps in Student Loan Default, and What Happens After*, The Brookings Institution (June 21, 2018), https://tinyurl.com/ybw8x8a3.

These harms from unnecessary defaults would affect not only borrowers, but also their families, communities, and local economies. Borrowers with children would face especially difficult challenges because, if forced to default, they would face seizure of benefits such as the Child Tax Credit and the Earned Income Tax Credit that are intended to lift families out of poverty. *See* Bureau of the Fiscal Service, *What is the Treasury Offset Program?*, U.S. Dep't of Treas., https://tinyurl.com/5cc7xzbd (last modified July 14, 2023); *see also* 26 U.S.C. § 6402(d) (collection of debts owed to federal agencies through tax refund offsets); 31 U.S.C. § 3720A (reduction of tax refunds by the amount of debt owed); 31

14

C.F.R. § 285.2 (implementing such offsets). And older or disabled borrowers would stand to lose a portion of the Social Security benefits on which they depend for basic life necessities. *See* 31 U.S.C. § 3716 (administrative offsets of federal benefits payment to collect debts owed to federal government); *see also* AARP, Student Loan Debt Can Sink Your Retirement Plan (Sept. 18, 2018), https://tinyurl.com/mppu8b35.

The ramifications for servicemembers would be particularly stark. Predatory institutions have historically targeted military veterans due to the widespread availability of GI Bill funds. *See* United States Senate, Health, Education, Labor and Pensions Committee, "Benefitting whom? For-Profit Education Companies and the Growth of Military Educational Benefits," Dec. 8, 2010, at 8-9, https://tinyurl.com/26z39pcp (citing "tremendous growth of military educational benefits flowing to for-profit schools[,]" where "[v]eterans interviewed . . . tell compelling stories of being misled by recruiters"). For active duty servicemembers and veterans, default not only carries the serious personal and economic risks described above, but can also lead to loss or suspension of security clearances. *See* National Security Adjudicative Guidelines, Office of the Director of National Intelligence, https://tinyurl.com/3j8yyas3 (eff. June 8, 2017) ("Conditions that could raise a security concern and may be disqualifying include . . . inability to satisfy debts[.]"); *see also* 84 Fed. Reg. 49,795 ("Commenters representing

15

military personnel and veterans noted that limiting borrower defense claims to

defaulted borrowers would . . . increase the likelihood of devastating and,

potentially, cascading consequences for military and veteran families[.]").

Nothing in the text of the Higher Education Act requires such wanton

infliction of hardship on borrowers in order to gain the relief Congress expressly

provided to address schools' misconduct. The Department's longstanding

interpretation and implementation of the statute as permitting affirmative claims is

both faithful to the statute's text and the most sensible reading for borrowers and

taxpayers.

## II.    The Borrower Defense Rule's Group Discharge Process Is Essential for Addressing Systemic Institutional Misconduct.

Recognizing that institutional misconduct often occurs at scale and affects

prospective students in comparable ways, the Department established a process in

the Borrower Defense Rule allowing "State Requestors" and others to submit

borrower defense claims for groups of similarly situated borrowers. 34 C.F.R.

§ 685.402; 87 Fed. Reg. 41,899 (July 13, 2022). Where the Department determines

that a group of borrowers may have a common defense to repayment, the Rule

establishes a "rebuttable presumption that the act or omission giving rise to the

borrower defense affected each member of the group in deciding to attend, or

continue attending, the institution." 34 C.F.R. § 685.406(b)(2).

16

The Department's rationale for creating this group process is borne out by numerous investigations conducted by *Amici* States, which have revealed pervasive and systematic misconduct on the part of predatory institutions.[1] *See* 87 Fed. Reg. 41,899. In such circumstances, where whole cohorts of prospective and enrolled students have been subjected to the same abuse and deception, it is both unnecessary and inefficient to require students to submit individual applications. In

---

[1] Representative actions by the States include: Argosy University, Assurance of Discontinuance (Jan. 26, 2022), Minnesota Attorney General's Office, https://tinyurl.com/yc5x2t76; Ashford University, LLC, Statement of Decision, California Attorney General's Office, https://tinyurl.com/bdcmmefc; Career Education Corporation, Press Release, Maryland Attorney General's Office (Jan. 3, 2019), https://tinyurl.com/5b6cwde4 ($493.7 million settlement with 49 state attorneys general); The Career Institute, LLC, Final Judgment, Massachusetts Attorney General's Office (June 1, 2016), https://tinyurl.com/yyhf9spk; Corinthian Colleges, Inc., Judgment, California Attorney General's Office (Oct. 10, 2013), https://tinyurl.com/p86r8hjn; DeVry University, Press Release, New York State Attorney General's Office (Aug. 17, 2017), https://tinyurl.com/2vappmnx; Education Corporation of America, Assurance of Voluntary Compliance, Pennsylvania Attorney General's Office (Apr. 6, 2021), https://tinyurl.com/36dxtv33; Education Management Corporation, Press Release, Illinois Attorney General's Office (Nov. 16, 2015), https://tinyurl.com/2hdhez5v ($102.8 million settlement with 40 state attorneys general); Lincoln Technical Institute, Inc., Consent Judgment, Massachusetts Attorney General's Office (July 15, 2015), https://tinyurl.com/26ebdarx; Kaplan Higher Education, LLC, Assurance of Discontinuance, Massachusetts Attorney General's Office (July 23, 2015), https://tinyurl.com/ye239hdy; Minnesota School of Business, Inc. and Globe University, Inc., Findings of Fact, Conclusions of Law and Order, Minnesota Attorney General's Office (Sept. 8, 2016); National College of Kentucky Inc., Complaint, Kentucky Attorney General's Office (Sept. 27, 2011), https://tinyurl.com/y37d6zhf; The Salter School, Judgment by Consent, Massachusetts Attorney General's Office (Dec. 11, 2014), https://tinyurl.com/4tsakc6m; Westwood College, Inc., Complaint, Illinois Attorney General's Office (Jan. 18, 2012).

17

the absence of a group process, the Department would be forced to needlessly

expend taxpayer resources adjudicating large numbers of individual applications,

and many students subjected to systemic misconduct would be deprived of relief

based on mere lack of means or knowledge to submit their own claims.

A.    **The States' Experience Uncovering Systemic Misconduct by Schools Affecting Entire Cohorts of Students Demonstrates the Propriety and Importance of a Group Claims Process.**

*Amici* States' investigations into school misconduct have demonstrated that

predatory institutions often commit abuse and deception not on a student-by-

student basis, but rather, as a pattern or practice that affects whole cohorts of

students comparably—whether through widespread dissemination of fraudulent

information to prospective students, reliance on improper recruitment tactics, or

deception involving the credentials of instructors. Such examples demonstrate the

practical wisdom of adjudicating the resulting borrower defense claims on a group-

wide basis.

As the Department's Rule itself reflects, the States have often uncovered

misconduct by schools—and, in particular, systemic misconduct. *See* 87 Fed. Reg.

41,886 (noting that, because evidence provided by "State partners" often "includes

information about widespread institutional policies or practice," such evidence

"could be particularly beneficial for decisions around whether to form and/or

approve a group borrower defense claim"). Since 2015, a total of 29 states have

submitted group discharge applications under prior iterations of the Borrower

Defense Rule. *See* 87 Fed. Reg. 66,030 (Nov. 1, 2022). Such group discharge

applications routinely include considerable evidentiary support establishing both

pervasive institutional misconduct and the reasonableness of the presumption that

all members of affected cohorts should be entitled to relief.

In one example, a bipartisan coalition of dozens of states submitted a group

borrower defense application to the Department requesting loan forgiveness on

behalf of "anyone who borrowed a federal student loan" to attend ITT Technical

Institute between 2007 and 2010. *See* Application for Borrower Defense on Behalf

of ITT Students (Apr. 1, 2021), at 7-8, https://tinyurl.com/2ed7frvt. The States'

submission detailed the widespread nature of ITT's false statements and deceptive

practices and presented the Department with overwhelming evidence of systemic

institutional misrepresentations that "went to the overall value of the education and

were substantial regardless of a borrower's current salary trajectory." *Id.* at 9.

Among numerous findings, the States' application described how ITT had relied

on a "Value Proposition Chart" to recruit students across 130 campuses,

fraudulently purporting to guarantee that graduates would achieve a particular

expected salary over their lifetimes. *Id.* at 2-6. ITT's blatant misrepresentations

included projecting annual earnings for its graduates at $100,000 more than the

average earnings of workers with the same credentials and failing to identify that

the majority of ITT's students failed to complete their degrees. *Id.* at 2-4. The

States also presented an expert economist's analysis of the blatant inaccuracy and

misleading nature of ITT's representations. *See id.* at 2-6. And the States then

provided the Department with legal analysis substantiating that the institutional

misconduct identified in the application violated the laws of the submitting states

and entitled broad cohorts of borrowers to relief under such laws. *Id.* at 11-64.

In another example, the Massachusetts Attorney General's Office submitted

a group borrower defense application after obtaining a judgment against then-

bankrupt Corinthian Colleges following years of egregious misconduct, including

routinely providing blatantly false job placement rates to prospective students. *See*

*Williams v. DeVos*, No. 16-11949-LTS, 2018 WL 5281741, at *4, *5 (D. Mass.

Oct. 24, 2018). The application included a 60-page memorandum supported by 34

exhibits containing hundreds of pages of documentary evidence with robust

statistical findings. *See id.* at *5. The application revealed how, for example,

Corinthian boasted to prospective students about in-field job placement rates

"often in excess of 70% . . . when actual in-field placement rates were as low as 20

to 40 percent[.]" *Id.* at *5. The evidence further showed that training at Corinthian

schools routinely entailed "self-taught instruction from workbooks" in spite of

promises of "hands-on training," and that instructors were generally "unqualified,

uninformed, and unconcerned with teaching." *Id.* This group application—like

others submitted by the states after exhaustive investigations—demonstrated how students were systemically lied to about the overall value of the education and were thus entitled to consideration of group-wide relief.[2]

In arguing that it is "unreasonable" to "presume" that borrowers can be affected by school misconduct on a group basis, Appellant's Br. 51, CCST simply ignores the evidence demonstrating the pervasiveness of many predatory schools' deception and the robust nature of the state group discharge claims the Department has historically considered. Similarly, CCST's claim that many misrepresentations are "too picayune" to justify universal relief, *id.*, is divorced from the reality of institutional misconduct. Far from picayune, the misconduct painstakingly detailed in the States' group submissions and described in the Rule, 87 Fed. Reg. 65,917-18, involves widespread deception designed to mislead cohorts of prospective students into spending thousands of dollars pursuing educational programs that may well be of little to no value to them.

Lastly, CCST's protestations elide the fact that the group discharge process does not *obligate* the Department to grant cohort-level relief if such group-based

---

[2] *See also, e.g.*, Senator Dick Durbin, *Question 6.4: Submissions by Attorneys General Seeking Relief for Constituents*, https://tinyurl.com/323dca9m (last accessed October 10, 2023) (listing similar applications for relief on behalf of Corinthian students); Application for Borrower Defense on Behalf of Borrowers that Attended Schools Operated by Education Corporation of America (Apr. 28, 2022), https://tinyurl.com/2p8a7ks3 (bipartisan group claim submitted by Alabama, California, Colorado, Maryland, Pennsylvania, and Virginia).

relief is not appropriate based on the facts and circumstances presented. Rather, the process allows States and other actors to present evidence that they believe establishes a basis for such cohort-level relief for the Department's consideration. The Department is the adjudicator and remains empowered to determine whether group-based relief is appropriate because of a qualifying impact on a whole cohort of students. And CCST has failed to suggest any reason why the Department is somehow less able to adjudicate the merits of an efficient group application, as opposed to numerous individual applications on the same grounds.

### B.   Eliminating the Group Discharge Process Would Waste Taxpayer Resources and Deprive Eligible Borrowers of Relief.

In the absence of an efficient group discharge process, the Department could be forced to adjudicate tens or hundreds of thousands of individual applications for borrower defense relief. Such an artificial constraint on the Department's authority would inflict an enormous waste of taxpayer resources where evidence demonstrates that a school's fraudulent conduct has affected an entire cohort of student borrowers—and would also deprive many eligible borrowers of relief.

*Amici* States' experiences underscore both of these concerns. Having prepared numerous group discharge applications, we are acutely aware of the substantial resources required to investigate and establish fraud and deception on an institutional level—applications that then each necessitate Departmental review. The evidence unearthed in our investigations into deception by schools like ITT

22

and Corinthian discussed above not only demonstrates the widespread nature of many institutions' misconduct, *see* Part II.A, *supra*, but also tacitly illustrates how improbable it is that an individual student would have been able to obtain relief for the deception to which they were subjected, without access to schools' internal documents via investigatory subpoena, and without the resources to hire an expert or conduct longitudinal analyses.

In addition to the onerous burden of establishing entitlement to relief based on systemic wrongdoing by institutions, *Amici* States' experience with meritorious borrower defense applications has also demonstrated another significant obstacle to the Department's ability to grant warranted relief via individual claims: most borrowers who have been defrauded by their schools are unaware of their entitlement to relief and indeed unaware of the borrower defense process more generally. In 2016, for example, the Department undertook a herculean effort to try to reach defrauded Corinthian borrowers who were eligible for relief. *See* Federal Student Aid Enforcement Office, *Report on Borrower Defense*, U.S. Dep't of Educ. (Oct. 28, 2016), https://tinyurl.com/2jat2hfr. These efforts required the Department to seek the assistance of a bipartisan group of forty-three state attorneys general to engage in massive outreach efforts—all in the context of borrowers who had *already* been determined to be eligible for relief. *Id.* at 3-4. All the more so if borrowers cannot benefit from such a group discharge process,

schools that have committed the most egregious and systemic misconduct will benefit from their wrongdoing at the expense of borrowers with meritorious claims who are unaware of or unable to obtain relief.

## CONCLUSION

For the foregoing reasons, *Amici* States urge this Court to affirm the order of the District Court denying CCST's motion for a preliminary injunction.

Respectfully submitted,

ANDREA JOY CAMPBELL
   *Attorney General of Massachusetts*

/s/ Elizabeth N. Dewar
Elizabeth N. Dewar
   *State Solicitor*
Yael Shavit
Michael N. Turi
   *Assistant Attorneys General*
One Ashburton Place
Date: October 10, 2023       Boston, MA 02108


ROB BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 North French Street
Wilmington, DE 19801

24

BRIAN L. SCHWALB
*Attorney General for the*
*District of Columbia*
400 6th Street NW, Suite 1800
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin
Luther King Jr. Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General of*
*Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General of*
*New Jersey*
Richard J. Hughes Justice Complex
25 Market St.
Trenton, NJ 08625

RAÚL TORREZ
*Attorney General of*
*New Mexico*
408 Galisteo St.
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General of*
*New York*
28 Liberty St.
New York, NY 10005

JOSHUA H. STEIN
*Attorney General of*
*North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

MICHELLE A. HENRY
*Attorney General of Pennsylvania*
16th Fl., Strawberry Square
Harrisburg, PA 17120

25

PETER F. NERONHA
*Attorney General of*
*Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

Robert W. Ferguson
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
*Attorney General of Wisconsin*
17 W. Main Street
Madison, WI 53703

## CERTIFICATE OF COMPLIANCE

1.      I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a 14-point proportionally spaced serif font.

2.      I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,295 words, excluding the parts of the brief exempted under Rule 32(f).

/s/ Elizabeth N. Dewar_____
Elizabeth N. Dewar

Date: October 10, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2023, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Elizabeth N. Dewar_____
Elizabeth N. Dewar

Date: October 10, 2023