No. 23-50491

# In the United States Court of Appeals for the Fifth Circuit

———————

Career Colleges and Schools of Texas,

*Plaintiff-Appellant,*

v.

United States Department of Education;
Miguel Cardona, Secretary, U.S. Department of Education,
in his official capacity as the Secretary of Education,

*Defendants-Appellees.*

———————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
No. 1:23-cv-00433-RP

———————

## REPLY BRIEF FOR APPELLANT

———————

Philip Vickers
Katherine Hancock
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
pvickers@canteyhanger.com
(817) 877-2800

Stephen B. Kinnaird
Allyson B. Baker
Michael Murray
Sameer P. Sheikh
Tor Tarantola
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
stephenkinnaird@paulhastings.com
(202) 551-1700

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

Table of Authorities ........................................................................ iii

Introduction ....................................................................................1

Argument .......................................................................................2

  I.   CCST has shown a likelihood of irreparable harm (and standing). ............2

     A.  Compliance Burdens and Costs ...............................................3

     B.  Impending Adjudications .......................................................7

     C.  Injury from Closed-School-Discharge Provisions ...............................10

  II.  Postponement of the Rule's effective date is warranted. .........................13

     A.  CCST has a strong likelihood of success. ...........................................14

       1.  The Secretary lacks power to authorize "claims" against the Department.......................................................................14

       2.  Congress did not authorize the Department to adjudicate borrower-defense or recoupment claims. .........................................18

       3.  The substantive and procedural provisions of the Rule's borrower-defense regulations are unlawful. ....................................22

       4.  The Rule's closed-school-discharge provisions are unlawful. .........25

     B.  The equities favor CCST. ....................................................27

     C.  Postponement of the effective date should not be party-restricted. ......28

Conclusion ....................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967)...............................................................13

*All. for Hippocratic Med. v. FDA*,
  78 F.4th 210 (5th Cir. 2023) ..............................................12

*Am. Airlines, Inc. v. Wolens*,
  513 U.S. 219 (1995).............................................................20

*America's Health Ins. Plans v. Hudgens*,
  742 F.3d 1319 (11th Cir. 2014) ...........................................4

*Ass'n of Am. R.Rs. v. Dep't of Transp.*,
  38 F.3d 582 (D.C. Cir. 1994)................................................6

*Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*,
  516 U.S. 264 (1996).............................................................19

*Beale v. Blount*,
  461 F.2d 1133 (5th Cir. 1972) ............................................15

*Bennett v. Spear*,
  520 U.S. 154 (1997).............................................................28

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988).......................................................10, 20

*Chamber of Com. of the U.S. v. U.S. Dep't of Lab.*,
  885 F.3d 360 (5th Cir. 2018) ..............................................15

*Chauffeur's Training Sch., Inc. v. Spellings*,
  478 F.3d 117 (2d Cir. 2007) ...............................................21

*Chem. Mfrs. Ass'n v. Dep't of Transp.*,
  105 F.3d 702 (D.C. Cir. 1997).............................................24

*Chevron Oil Co. v. Andrus*,
  588 F.2d 1383 (5th Cir. 1979) ..............................................8

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)........................................................................6

*Contender Farms, LLP v. U.S. Dep't of Agric.,*
    779 F.3d 258 (5th Cir. 2015) ...............................................3, 6, 7, 12

*Fed. Maritime Comm'n v. S.C. State Ports Auth.,*
    535 U.S. 743 (2002)......................................................................15

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989).........................................................29

*Int'l Fabricare Inst. v. EPA,*
    972 F.2d 384 (D.C. Cir. 1992)........................................................12

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ...........................................................18

*Lonchar v. Thomas,*
    517 U.S. 314 (1996)......................................................................23

*Minnesota v. United States,*
    305 U.S. 382 (1939)......................................................................15

*Nat'l Fuel Gas Supply Corp. v. FERC,*
    811 F.2d 1563 (D.C. Cir. 1987).......................................................19

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,*
    139 S.Ct. 2051 (2019)...................................................................29

*Rest. L. Ctr. v. U.S. Dep't of Lab.,*
    66 F.4th 593 (5th Cir. 2023) ....................................................3, 5, 6, 12

*RLC Indus. Co. v. Comm'r,*
    58 F.3d 413 (9th Cir. 1995) .......................................................18, 19

*Sierra Club v. Morton,*
    405 U.S. 727 (1972)......................................................................28

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)........................................................................9

iv

*Sweet v. Cardona*,
No. 3:19-cv-03674-WHA, 2023 WL 2213610 (N.D. Cal. Feb. 24, 2023) ......7, 8

*Texas v. United States*,
497 F.3d 491 (5th Cir. 2007) ...................................................................13

*Thomas v. Union Carbide Agric. Prods. Co.*,
473 U.S. 568 (1985)................................................................................13

*United States v. Mead Corp.*,
533 U.S. 218 (2001)................................................................................17

*West Virginia v. EPA*,
142 S.Ct. 2587 (2022)..............................................................................18

## Constitutional Provisions

U.S. Const. art. III ...................................................................................28

## Statutes

5 U.S.C. § 705.................................................................................2, 13, 29

5 U.S.C. § 706........................................................................................28

20 U.S.C. § 1082(a) ................................................................................15

20 U.S.C. § 1087(c)(1)..................................................................16, 26, 27

20 U.S.C. § 1087e ...................................................................................18

20 U.S.C. § 1087e(h) .......................................................................*passim*

20 U.S.C. § 1094(b)-(c) ...........................................................................21

20 U.S.C. § 1094(c) .................................................................................21

20 U.S.C. § 1094(c)(1)(F)..........................................................................21

20 U.S.C. § 1099c-1(a)(1)..........................................................................21

28 U.S.C. § 1346(a)(2)................................................................18

28 U.S.C. § 1491(a)(1)...............................................................18

28 U.S.C. § 1652........................................................................20

**Regulations**

34 C.F.R. § 668.125(e)(2)..........................................................19

34 C.F.R. § 685.207...................................................................16

34 C.F.R. § 685.214(a)(2)(i).......................................................26

34 C.F.R. § 685.214(a)(2)(ii)......................................................26

34 C.F.R. § 685.214(c).........................................................11, 27

34 C.F.R. § 685.214(c)(1)-(3) (July 1, 2019) ...........................11

34 C.F.R. § 685.214(d) ..............................................................26

34 C.F.R. § 685.214(d)(1)(i)(B)..................................................11

34 C.F.R. § 685.400 .....................................................................8

34 C.F.R. § 685.401(a)...............................................................23

34 C.F.R. § 685.401(b)(3)..........................................................20

34 C.F.R. § 685.401(c)...............................................................20

34 C.F.R. § 685.402...................................................................10

34 C.F.R. § 685.402(a)...............................................................24

34 C.F.R. § 685.406(b) ..............................................................10

34 C.F.R. § 685.406(b)(2)..........................................................23

59 Fed. Reg. 61664 (Dec. 1, 1994).........................................16

60 Fed. Reg. 37768 (July 21, 1995).........................................16

81 Fed. Reg. 39330 (June 16, 2016) .........................................................17

81 Fed. Reg. 75926 (Nov. 1, 2016) ...........................................................20

83 Fed. Reg. 37242 (July 31, 2018) ..........................................................17

84 Fed. Reg. 49788 (Sept. 23, 2019) ........................................................17

87 Fed. Reg. 65904 (Nov. 1, 2022) .....................................................*passim*

**Other Authorities**

Project on Predatory Student Lending at the Legal Services Center of
Harvard Law School, Comment Letter on Proposed Rule (Aug. 2, 2018) ........17

Restatement (Second) of Contracts (1981) ................................................14

Settlement Agreement, *Sweet v. Cardona,* No. 3:19-cv-03674-WHA,
ECF No. 246-1 (N.D. Cal. filed June 22, 2022) .....................................8

State Bar of Texas, *2019 Income and Hourly Rates* ................................10

U.S. Dep't of Educ., Fed. Student Aid, *Borrower Defense to Repayment
Loan Forgiveness Data* ................................................................5, 8, 9

U.S. Dep't of Educ., Press Release, *Education Department Takes Steps to
Hold Leaders of Risky Colleges Personally Liable* (Mar. 2, 2023).....................5

U.S. Dep't of Educ., *Supporting Statement for Paperwork Reduction Act
Submission*, OMB No. 1845-0163 (rev. June 23, 2023) ....................................10

**INTRODUCTION**

The Department of Education tells this Court that the borrower-defense and closed-school-discharge regulations, *see* 87 Fed. Reg. 65904 (Nov. 1, 2022) ("the Rule"), present so little risk of injury to the members of plaintiff Career Colleges & Schools of Texas ("CCST") that CCST does not even have standing to challenge them, much less seek postponement of their effective date. The Department sang a different tune in the Rule itself. There, the Department stated that "[t]hese regulations should have a deterrent effect dissuading institutions from engaging in conduct that would give rise to a defense to repayment," arising from the risks both of liability and "punishment," and from the "rigorous group claim process." *Id.* at 65908. The Department "expect[ed] a deterrent effect from the regulations as institutions adjust their behavior, even in circumstances where an institution is not subject to recoupment." *Id.* at 65994. Thus, the Department expected immediate compliance from schools that are *directly regulated* by the Rule.

The Department's predictions have proven true. Leaders of CCST member schools testified to the ongoing and future compliance costs they are incurring to train staff on the new regulations and to monitor communications to avoid liability under the Rule's new strict-liability regime, wherein even inadvertent errors in communications regarding educational services, costs, financing, or outcomes can

1

shift borrowers' entire student debts to the school. This Court has recognized that regulations almost always result in irreparable compliance costs. Moreover, CCST proved other forms of irreparable injury: namely, immediate compelled participation in unlawful administrative proceedings, and the alteration of business operations to avoid liability.

If it finds irreparable injury, this Court should postpone the Rule's effective date. The Department does not contest this Court's power under 5 U.S.C. § 705 to postpone the effective date without remand. The Department offers no colorable arguments regarding its statutory authority to adjudicate borrower defense "claims" or recoupment, and does not meaningfully engage with CCST's substantive challenges. Because CCST's likelihood of success on its purely legal challenges is overwhelming, and the balancing of equitable factors favors CCST, this Court should postpone the Rule's effective date.

## ARGUMENT

## I.    CCST has shown a likelihood of irreparable harm (and standing).

The Department erects a straw man, arguing that CCST has failed to show an impending threat of recoupment liability. But that is not the standard. As regulated parties, CCST's members may establish irreparable harm (and standing) by showing that conforming their behavior to the new regulations, and taking reasonable steps to avoid liability, imposes unrecoverable costs.

2

### A.    Compliance Burdens and Costs

"Complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (cleaned up). And "the ordinary rule" is that parties subject to a regulation have standing to challenge it. *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). "An increased regulatory burden typically satisfies the injury in fact requirement." *Id.*

As detailed in CCST's opening brief ("CCSTBr." at 23-31), the district court heard uncontradicted evidence of several types of concrete continuing and future compliance costs that CCST members will incur:

- Expanding monitoring and recordkeeping of all communications with current and prospective students (CCSTBr. 25-26);

- Developing systems for indefinite retention of records of such communications (CCSTBr. 27);

- Training current staff to perform these additional functions and to otherwise ensure Rule compliance (CCSTBr. 27-28); and

- Hiring at least one new staff member to assist with compliance (CCSTBr. 28).

Notably, these harms receive only fleeting reference in the Department's standing arguments, and only one (training) is specifically addressed in its

irreparable-injury arguments. The Department's brief ("DBr." at 25-26) mostly parrots the district court's findings without addressing CCST's contrary evidence or arguments.

The Department faults (DBr. 26) CCST for "never explain[ing]" why the Rule would require any additional staff training beyond the status quo. As the record establishes, the explanation—with respect to training and other costs—is that the Rule's new prohibitions and strict-liability standard, the removal of limitations periods for borrowers, and the threat of draconian liability, require schools to strictly monitor, record, and indefinitely retain all communications with students. CCSTBr. 25-28. This, in turn, requires ongoing training, *id.* at 26-28, and hiring new staff, *id.* at 28.

By contrast, the standard set out in the 2019 regulations makes only intentional and reckless misrepresentations actionable, which does not require the same scrutiny and recordkeeping to guard against potentially existential liability. CCSTBr. 25-26. Instituting monitoring systems and redesigning recordkeeping systems to mitigate liability risks are new, concrete compliance costs. *Cf. America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014) (finding "costs and burdens" of "modifying … claims processing systems" and "of monitoring compliance" to justify preliminary injunction of a health-insurance

law). So too is hiring new staff, ROA.1406:25-1407:9, and increasing training by two to three times for upwards of 250 employees, CCSTBr. 27-28.

These costs parallel the defensive recordkeeping and additional management time that this Court credited in *Restaurant Law Center*, 66 F.4th at 598-99. The Department implies (DBr. 25) that the holding there depended on the rulemaking's prediction of the asserted compliance costs. But that was not the Court's holding. Nor would such a holding make sense—courts, not agencies, decide whether likely irreparable harm has been shown.

The Department's argument is a surprising one for a regulatory agency. It asserts (DBr. 23 n.3), in essence, that schools' efforts to comply with the Rule are unreasonable because it is purely speculative that a school would ever be held accountable for violating it. Even if the Department had not promised aggressive enforcement[1]—and setting aside that borrowers have been filing new claims at a rate of nearly 30,000 per month[2]—this argument would nonetheless be untenable.

---

[1] *See, e.g.*, U.S. Dep't of Educ., Press Release, *Education Department Takes Steps to Hold Leaders of Risky Colleges Personally Liable*, https://www.ed.gov/news/press-releases/education-department-takes-steps-hold-leaders-risky-colleges-personally-liable (Mar. 2, 2023) (quoting Federal Student Aid Chief Operating Office Richard Cordray) ("When financially risky schools jeopardize the safety of the government's Title IV funds and take advantage of students, we intend to hold those individuals accountable.").

[2] *See* U.S. Dep't of Educ., Fed. Student Aid, *Borrower Defense to Repayment Loan Forgiveness Data*, https://studentaid.gov/data-center/student/loan-forgiveness/borrower-defense-data (last visited Oct. 22, 2023) [hereinafter *BDR Data*] (linking to monthly reports showing a total of 779,785 applications received

Parties who are the objects of a regulation easily demonstrate concrete injury. *Contender Farms*, 779 F.3d at 266. And when that injury is "more than de minimis" and unrecoverable—which, when challenging a rulemaking, it "almost *always*" is—it constitutes irreparable harm. *Rest. L. Ctr.*, 66 F.4th at 597, 600 (citations omitted).

Notably, none of the Department's cited authority involves compliance costs borne by regulated parties. *See* DBr. 21, 24-25, 28-29. In *Clapper v. Amnesty International*, on which the Department relies heavily, the challengers were lawyers and various organizations who were concerned that a surveillance program might target their communications with overseas parties. 568 U.S. 398, 406 (2013). In declaring this fear speculative, the Court distinguished cases brought by regulated parties. *Id.* at 420.

The Department fails to cite *Contender Farms*, which is on point. There, horse-show participants challenged a regulation prohibiting "soring," the practice of injuring horses' legs in order to achieve a more desirable gait. 779 F.3d at 262 & n.1. The plaintiffs did not sore their horses, but the Court nevertheless found standing based in part on the threat of harsher, mandatory sanctions. *Id.* at 266. The Court also cited with approval *Association of American Railroads v. Department of*

---

as of January 31, 2023, the most recently published data, up from 424,984 at the end of January 2022).

*Transportation*, 38 F.3d 582, 585 (D.C. Cir. 1994), which found that merely being subject to additional regulatory oversight established standing to challenge the underlying rulemaking. *Contender Farms*, 779 F.3d at 266.

Under this Court's precedents, CCST has established a likelihood of concrete and irreparable injury to its members traceable to the Rule's new requirements.

## B.    Impending Adjudications

The Department cannot seriously dispute that CCST members face the immediate prospect of having to answer borrower-defense claims, nor that the cost of answering such claims is more than de minimis. Instead, the Department quibbles around the edges.

It is a statistical near-certainty—a probability of more than 99.999 percent—that at least one CCST member school has already been the subject of a borrower-defense claim. ECF No. 12-1 at 20 n.1. More than 206,000 such claims were filed in the short period after the settlement in *Sweet v. Cardona* was executed and before it was approved by the district court—the so-called "Post-Class Applicants." *See* ROA.435-36; *Sweet v. Cardona*, No. 3:19-cv-03674-WHA, 2023 WL 2213610, at *2 (N.D. Cal. Feb. 24, 2023). Those claims covered 65 percent of all Title IV schools, *see* ROA.435-36, making it a virtual certainty that at least one of CCST's 50-plus Title IV schools was among them.

7

Instead of disputing this, the Department incorrectly asserts (DBr. 22 n.2) that these 206,000 claims are subject to specific procedures set out on pages 7 and 8 of the *Sweet* settlement agreement. Those procedures are specific to *Sweet* "Class Members," a group including only borrowers who filed claims by the settlement's execution date. Settlement Agreement, *Sweet v. Cardona*, No. 3:19-cv-03674-WHA, ECF No. 246-1, at 5-6 (N.D. Cal. filed June 22, 2022). The 206,000 Post-Class Applicants, by contrast, are not subject to specific adjudicatory procedures; the settlement only requires that the Department apply the substantive standards from the 2016 regulations and complete adjudications within a specific timeframe. *Id.* at 11. Since the Rule's procedures apply to all "applications pending with the Secretary on July 1, 2023," 34 C.F.R. § 685.400, they govern pending Post-Class Applicants' claims as well. "[A]n agency must abide by its own regulations." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979). In any event, there is little reason to think that the many thousands of claims filed each month since then[3] do not encompass a similarly broad swath of schools.

While the Department faults (DBr. 27) CCST for not identifying a pending borrower-defense claim against a member, it fails to acknowledge that the

---

[3] *See BDR Data*, *supra* note 2 (showing 16,985 total borrower-defense claims filed in December 2022 and January 2023, the last month for which the Department has published data). Borrowers who filed claims after November 16, 2022, are not considered Post-Class Applicants.

Department has not made such information public. Nor does the Department assert that a CCST member is *not* the subject of a pending claim—which it presumably would have done if that were true.

Furthermore, CCST need only prove a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). The Rule was driven by the Department's "concern[] that too many borrowers have been unable to access loan relief authorized by statute." 87 Fed. Reg. at 65905. The Department's extreme liberalization of discharge regulations—where schools have strict liability; where injury is presumed in group claims and effectively unrebuttable; and where the prize is the discharge of a borrower's entire student debt—means that claims will only increase. As of January 31, 2023, borrowers in Texas have already filed more than 67,000 borrower-defense claims. *BDR Data*, *supra* note 2. CCST members are virtually certain to be the subject of new claims if the Rule goes into effect.

The Department does not deny that, once a claim is filed, schools are immediately compelled to participate in discharge proceedings to protect their reputations and preserve defenses. Coerced subjection to adjudication in an unlawful forum is itself irreparable injury. CCSTBr. 35-36. And investigating and mounting any legal defense is costly. The Department quibbles (DBr. 27) that its

(wildly low) $17,611 cost estimate[4] was specific to group claims, not individual claims. But the Department does not say why the cost to respond to an individual claim would be significantly different, let alone de minimis—especially since group claims (unlike individual claims) do not require proof of harm to specific borrowers. *See* 34 C.F.R. §§ 685.402, 685.406(b). After all, the Department did not include a separate cost estimate for individual claims in the Rule's preamble.[5]

## C. Injury from Closed-School-Discharge Provisions

CCST's members similarly are injured by the Rule's changes to the closed-school-discharge provisions.

The Department now appears to concede (DBr. 29-30) that those provisions cannot be applied retroactively. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988) ("Even where some substantial justification for retroactive

---

[4] This estimate assumed an hourly cost of $46.59. 87 Fed. Reg. at 66031. In reality, schools would likely retain counsel, who, in Texas, charge a median hourly fee of about $300. *See* State Bar of Texas, *2019 Income and Hourly Rates* 3, https://www.texasbar.com/AM/Template.cfm?Section=Demographic_ and_Economic_Trends&Template=/CM/ContentDisplay.cfm&ContentID=54237 (last visited Oct. 20, 2023).

[5] The Department's later cost estimate for the "institutional response" requirement included only the time it would take a school employee to read and sign the affidavit accompanying the submission of documents. U.S. Dep't of Educ., *Supporting Statement for Paperwork Reduction Act Submission*, OMB No. 1845-0163, at 8 (rev. June 23, 2023), available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202307-1845-007.

rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant."). While the Department disclaims (DBr. 30) "any intent" to enforce those provisions for conduct predating the Rule's effective date, the amended regulations on their face do not prohibit it. Indeed, the Rule removes temporal limitations previously in place. *Compare* 34 C.F.R. §§ 685.214(c)(1)-(3) (July 1, 2019) *with id.* §§ 685.214(c), (d)(1)(i)(B) (July 1, 2023). The Department points to a preamble statement that "[t]he Department … is unable to retroactively implement the regulation." 87 Fed. Reg. at 65992. But the preamble also states that "there is no cut-off date for eligibility for an automatic closed school discharge," and that "[t]he process for closed school discharges before November 1, 2013, and on or after November 1, 2013, will not be substantially different." *Id.* at 65969. CCST unquestionably has standing to challenge these provisions, and the Department should revise the closed-school-discharge regulations in conformity with its concession.

But the closed-school-discharge provisions also cause irreparable injury prospectively. CCSTBr. 31-34. The Department wrongly claims (DBr. 28) that a school can only challenge the Rule after the Department imposes recoupment liability or if the school is at least "planning to close." As discussed above, a regulated party compelled to abide by a new regulation, under threat of significant

11

sanction, is entitled to challenge that regulation prior to enforcement. *See Contender Farms*, 779 F.3d at 266; *Rest. L. Ctr.*, 66 F.4th at 597.

The Department misunderstands CCST's evidence. CCST is not claiming future recoupment liability as irreparable injury. Rather, its members face immediate injury from having to alter business operations under the threat of severe liability. And heightened liability risks constitute irreparable injury. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 251 (5th Cir. 2023) (recognizing doctors' "heightened exposure to malpractice liability" as irreparable injury); *cf. Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992) (risk of increased CERCLA liability conferred standing).

Here, the President of ECPI University testified that the Rule's new "closure date" definition prevents ECPI from consolidating locations in Richmond, Virginia, because of the greater liability risks of relocating programs gradually. ROA.1399:4-1400:2. If ECPI were to relocate a program in which the majority of the location's students were enrolled, *all* students at that location would be entitled to a full discharge after closure if they withdrew 180 days before that relocation or later. Altering current business operations in this way to avoid liability is a present, ongoing injury that justifies postponement of the Rule's effective date.

Here the Department again relies (DBr. 28-30) on an implausible argument—that liability risks from closing a location are speculative. Given that

more borrowers are entitled to *automatic* discharges under the Rule, the

Department wisely does not suggest that discharges are an uncertain consequence

of closing a location. But the risk of recoupment post-closure is not speculative

either, particularly when the Department declares recoupment "a statutory

requirement." 87 Fed. Reg. at 65968.

*****

For all the foregoing reasons, CCST has shown a likelihood of standing and

irreparable injury on multiple grounds. Moreover, this dispute is ripe for review

because (1) the issues are fit for judicial determination and (2) CCST's members

would suffer hardship from denial of pre-enforcement review. *Abbott Lab'ys v.

Gardner*, 387 U.S. 136, 149 (1967), *abrogated in other respects by Califano v.

Sanders*, 430 U.S. 99 (1977). The issues presented are "purely legal, and will not

be clarified by further factual development." *Thomas v. Union Carbide Agric.

Prods. Co.*, 473 U.S. 568, 581 (1985). Hardship inheres in the creation of unlawful

legal obligations, the practical impairment of interests, and the need to "modify

one's behavior in order to avoid future adverse consequences." *Texas v. United

States*, 497 F.3d 491, 499 (5th Cir. 2007) (cleaned up).

## II.   Postponement of the Rule's effective date is warranted.

The Department does not contest this Court's power under 5 U.S.C. § 705 to

postpone the Rule's effective date without remand. CCSTBr. 38-39. CCST's likely

success on the merits and the balancing of equitable factors favor such

postponement.

### A.    CCST has a strong likelihood of success.

#### 1.    The Secretary lacks power to authorize "claims" against the Department.

Section 455(h) of the Higher Education Act ("HEA") provides that "the

Secretary shall specify in regulations which acts or omissions of an institution of

higher education a borrower may *assert as a defense* to repayment of" a Direct

Loan. 20 U.S.C. § 1087e(h) (emphasis added). As a matter of plain meaning, one

asserts defenses to claims by an adverse party, the polar opposite of asserting

*claims* against that party. CCSTBr. 39-40.

The Department and its amici argue the contrary by conflating two distinct

issues. In contract law, certain conduct (for example, fraud in the inducement or

material breach) may establish a defense in an action to enforce the contract, *see,*

*e.g.,* Restatement (Second) of Contracts §§ 163, 237 (1981), or form the basis of an

affirmative claim for restitution, damages, or rescission, *id.* §§ 344, 374-76. But

there is still a profound difference between "assert[ing]" conduct "as a defense," 20

U.S.C. § 1087e(h), and asserting an affirmative claim for relief. Congress

authorized only the former in Section 455(h).

That matters because "[o]nly Congress may create privately enforceable

rights, and agencies are empowered only to enforce the rights Congress creates."

14

*Chamber of Com. of the U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 384 (5th Cir. 2018). The lack of such legislative empowerment defeats the Rule. *See* ECF No. 42-1, at 1-2 (citing *Chamber* in granting interim injunction). The Department weakly attempts to limit *Chamber* to suits against private parties (DBr. 39-40), but separation-of-powers principles require legislative creation of any private enforcement rights.

Indeed, the authorization of enforcement rights *against* the Government must be unequivocal to overcome sovereign immunity, which (contrary to the Department's view, DBr. 36) applies to administrative as well as court adjudication. CCSTBr. 43; *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760-61 (2002). The Department concedes (DBr. 35), as it must, that the Rule creates enforceable rights "against the Department," 87 Fed. Reg. at 65909-10, but avers (DBr. 36) that sovereign immunity can only be invoked against claims for money damages. To the contrary, sovereign immunity applies to any claim against the Government (monetary or injunctive), *Beale v. Blount*, 461 F.2d 1133, 1137 (5th Cir. 1972), and applies to a remedy that the Department likens to rescission and restitution, CCSTBr. 43. Furthermore, the Department cannot invoke (DBr. 36) the statutory waiver of sovereign immunity that applies only to actions against the Department in state or federal district courts. *See* 20 U.S.C. § 1082(a); *Minnesota v. United States*, 305 U.S. 382, 388-89 (1939).

Finally, the Department suggests (DBr. 31-32) it can capture statutory authority by adverse possession, because allegedly thirty years of regulations have permitted affirmative borrower-defense claims. That mischaracterizes the 1994 regulation, which provided only that a borrower defense could be asserted "[i]n any proceeding to collect on a Direct Loan." 59 Fed. Reg. 61664, 61696 (Dec. 1, 1994); CCSTBr. 40. While the Department did not intend its enumeration of four types of collection proceedings to be exhaustive, 59 Fed. Reg. at 61696; DBr. 34, it did not authorize affirmative claims. The next year, the Department clarified that "[t]he regulation does not provide a private right of action for a borrower and is not intended to create new Federal rights in this area." 60 Fed. Reg. 37768, 37769 (July 21, 1995). Rather, just like an FFEL borrower could present a defense "to the guaranty agency or the Department *during the collection process*," the Direct Loan borrower could do the same. *Id.* at 37770 (emphasis added). Congress legislated against this backdrop of administrative collection proceedings.[6] Moreover, "a defense to repayment" is not synonymous with a "discharge" or a cancellation, *see* CCST Br. 5, and would arise only when repayment obligations have begun, *see* 34 C.F.R. § 685.207.

---

[6] The Department cites no regulation to support its contention that FFEL borrowers could make affirmative claims rather than raise defenses in collection proceedings. DBr. 33. Regardless, Section 455(h) is a different statute, authorizing only the specification of defenses. *Compare* 20 U.S.C. § 1087e(h) *with id.* § 1087(c)(1).

Indeed, the Department acknowledged in 2016 that "[t]he current regulations for borrower defense do not provide a process for claims." 81 Fed. Reg. 39330, 39346 (June 16, 2016). In 2018, the Department declared that "[f]rom 1994 to 2015, the Department's regulation … provided defense to repayment loan discharge opportunities only to borrowers who were in a collection proceeding[]." 83 Fed. Reg. 37242, 37253 (July 31, 2018). The Department then amended that statement to acknowledge "limited circumstances" in which "the Department has approved a small number of affirmative borrower defense to repayment requests." 84 Fed. Reg. 49788, 49796 (Sept. 23, 2019). Those few instances either settled litigation or involved unpaid refunds or factual stipulations in judgments that established the defense.[7] These ad hoc resolutions lack the force of law and do not command deference in statutory interpretation. *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). The Rule reflects no longstanding contemporaneous agency construction of the statute. But regardless, the Department's views cannot cure an absence of statutory authority.

---

[7] *See* Project on Predatory Student Lending at the Legal Services Center of Harvard Law School, Comment Letter on Proposed Rule (Aug. 2, 2018), available at https://www.regulations.gov/comment/ED-2018-OPE-0027-0011 (attachments).

17

### 2. Congress did not authorize the Department to adjudicate borrower-defense or recoupment claims.

Even if Section 455(h) authorized the Department to create private rights of action, nothing in the statute authorizes the Department to adjudicate such claims. The Department does not contest that borrowers would be able to assert those claims in court. *See* 28 U.S.C. §§ 1346(a)(2), 1491(a)(1); CCSTBr. 41.

The Department ignores established precedents that (1) "[a]gencies have only those powers given to them by Congress," *West Virginia v. EPA*, 142 S.Ct. 2587, 2609 (2022); (2) agencies may only adjudicate public rights; and (3) statutory authorization to adjudicate public rights must be express because only Congress can commit public rights to agency adjudication, CCSTBr. 42-43. The Department attempts (DBr. 35-36) to cabin those principles to agency adjudication of private-party disputes. But an agency can adjudicate claims against the Government only if they involve public rights, *Jarkesy v. SEC*, 34 F.4th 446, 457-58 (5th Cir. 2022), *cert. granted*, 143 S.Ct. 2688 (2023), and the Department tellingly ignores cited precedent involving disputes with the Government, *see, e.g.*, *RLC Indus. Co. v. Comm'r*, 58 F.3d 413, 417-18 (9th Cir. 1995) (adjudication of tax allowances, cited at CCSTBr. 43).

Indeed, *RLC* contradicts the Department's position (DBr. 35) that adjudicatory power can be implied from Section 455's grant of a limited

*rulemaking* power.[8] The Ninth Circuit held that the statutory grant of rulemaking power regarding depletion allowances "does not subsume within it the authority to decide individual cases" and instead "merely gives the Commissioner the authority to prescribe regulations setting forth standards by which courts will determine the reasonableness of depletion allowances." *RLC*, 58 F.3d at 417-18; *see also Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 273 (1996) (denying adjudicatory power where statute did not authorize agency "to function as both regulator and adjudicator").

The Department's putative private-dispute distinction (Br. 35-36) is also illusory because, notwithstanding the bifurcation of the discharge and recoupment proceedings, the object of the regulation is to shift debt liability to schools. In a recoupment proceeding, the Rule assigns schools the burden of proving "that the decision to discharge the loans was incorrect or inconsistent with law." 34 C.F.R. § 668.125(e)(2).

Finally, the Department does not even defend its unconstitutional arrogation of power to adjudicate private state-law rights, instead stating (DBr. 38) that the

---

[8] The Department mischaracterizes (DBr. 35) *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563 (D.C. Cir. 1987), as recognizing that Congress may implicitly grant adjudicatory authority. *National Fuel* says the opposite; it declares that, in "contrast" to an implicit delegation to an agency to resolve ambiguities in statutes it administers, "the delegation of adjudicative authority to an agency that is empowered to hear disputes, receive settlement proposals, and enter binding orders is *explicit*." 811 F.2d at 1569 (emphasis added).

defenses merely "might resemble state law causes of action." That is untrue; the regulation establishes defenses for an institution's "fail[ure] to perform its obligations under the terms of a contract," 34 C.F.R. § 685.401(b)(3), which are governed by state law, as well as certain acts or omissions giving rise to "a cause of action against the school under applicable State law," *id.* § 685.401(c). If the Department contemplates developing its own federal common law of contracts, *see* 87 Fed. Reg. at 65926, that underscores the Rule's unlawfulness. Congress requires courts to apply governing state law, 28 U.S.C. § 1652, and would not have given the Department that claimed power. *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 232 (1995) (agreeing that agency had "neither the authority nor the apparatus required to superintend a contract dispute resolution regime").

The Department likewise lacks authority to adjudicate recoupment claims. Abandoning its prior (indefensible) statutory and common-law arguments, *see* 81 Fed. Reg. 75926, 75931-32 (Nov. 1, 2016), the Department now for the first time attempts (DBr. 37) to ground its authority in an amalgam of different statutory provisions. The post-hoc rationalizations of the Department's lawyers are not entitled to deference. *Bowen*, 488 U.S. at 212. Regardless, the provisions governing audits and program reviews (which are administrative and not adjudicatory), and authorizing the Secretary to review such determinations after a

hearing, say nothing about adjudication of recoupment claims. *See* 20 U.S.C. §§ 1094(b)-(c), 1099c-1(a)(1).

The Department points (DBr. 38) to *Chauffeur's Training School, Inc. v. Spellings*, 478 F.3d 117 (2d Cir. 2007), but its reliance is unavailing. There, because a statute (20 U.S.C. § 1094(c)(1)(F)) authorized hearings for terminations, suspensions, and fines, the Second Circuit held that "it would be unreasonable to view the specification of remedies set forth in § 1094(c)" as excluding relief to recover guarantee payments. 478 F.3d at 127. That analysis is wrong. But, significantly, the Department here is not grafting additional remedies onto an *authorized* statutory proceeding; indeed, for recoupment, the Department does not allow schools hearings under Subpart G of Part 668 of its regulations, which implements § 1094(c). *See* 87 Fed. Reg. at 65949. *Chauffeur's* does not support the Department's wholesale creation of a novel adjudication scheme untethered to any authorized statutory hearing, in which the Department decides its own claims for financial recovery.

Confronted with the 2015 Corinthian Colleges bankruptcy, the Department did not seek the proper authority from Congress, but took matters into its own hands, stretching the rarely invoked Section 455(h) beyond recognition to exercise extraordinary economic power over the education sector. It had no power to promulgate the Rule, but the major-questions doctrine forbids this maneuver

regardless. CCSTBr. 45-46. The Department and its amici insist that administrative adjudications of discharge and recoupment claims make eminent sense. But they must direct that argument to Congress.

### 3. The substantive and procedural provisions of the Rule's borrower-defense regulations are unlawful.

The Department does not meaningfully engage with CCST's challenges to the Rule's substantive and procedural provisions.

*First*, the Department claims (DBr. 43) that the APA does not require specifically defined defenses. But Section 455(h) requires the Department to "*specify in regulations which acts or omissions* of an institution of higher education" can be asserted as borrower defenses. 20 U.S.C. § 1087e(h) (emphasis added). The Rule's open-ended definitions do not satisfy that requirement. CCSTBr. 46-47.

*Second*, the Department dubiously maintains (DBr. 43) that the Rule does not create a strict-liability regime but instead "require[s] culpable conduct by a borrower's institution." But the Rule does not require scienter or even negligence; inadvertent acts or omissions are actionable. CCSTBr. 47-49. The Department points (DBr. 43-44) to the mushy standard by which the presiding Department employee can consider the nature and degree of the act or omission in deciding whether to discharge a borrower's entire debt. But the Department does not deny that inadvertent acts can result in discharges. The Department deems it "unlikely"

that inadvertent *and* harmless acts will result in discharges. DBr. 43-44 (quoting 87 Fed. Reg. at 65921). But that would be determined arbitrarily by "the length of each chancellor's foot," *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)—or the foot of the designated Department employee, who need not be legally trained, *see* 34 C.F.R. § 685.401(a) (*Department official*).

*Third*, the Department does not respond to CCST's argument that the entire-debt discharge provision is ultra vires. CCSTBr. 47-48. Regarding CCST's second argument that the entire-discharge provision abrogates the Rule's causation requirement, the Department oddly responds (DBr. 44) by quoting that requirement. But it does not (and cannot) deny the operation of the Rule—the borrower can roll up all *preexisting* debt into a Direct Consolidation Loan and have it discharged (including after the discharge proceeding), even though this preexisting debt cannot possibly have been caused by the school's act or omission. CCSTBr. 49.

*Fourth*, the Department cannot justify the extraordinary presumption and unfair procedures employed in the group-claim process. The Department presumes that *any* "act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." 34 C.F.R. § 685.406(b)(2). The Department again ignores CCST's argument that the creation of evidentiary presumptions is ultra

23

vires. CCSTBr. 50. And the Department ignores the legal standard for establishing a presumption, which requires that "proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of the inferred fact ... until the adversary disproves it." *Chem. Mfrs. Ass'n v. Dep't of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997) (cleaned up). It does not answer CCST's arguments that mere proof of an act or omission does not justify inferences that (1) every borrower received a communication, (2) relied upon it to make attendance decisions, and (3) did so reasonably. Those three inferred facts are so dependent on the borrower's circumstances that they cannot be presumed in the group-claim process. CCSTBr. 51.

The Department claims (DBr. 46) that a presumption might be justified for widely distributed mass communications, but the presumption is not so limited. "[T]he likelihood of actionable acts or omissions that were pervasive or widely disseminated" is but one optional consideration in forming a group; the Secretary can also form groups, for example, to promote "compliance by an institution." 34 C.F.R. § 685.402(a). Furthermore, at most, wide dissemination might *arguendo* justify a presumption that a communication was received. It does not justify a presumption that each borrower would reasonably have made attendance decisions based upon it, which depends on the nature of the communication and the borrower's circumstances. Finally, the Department cannot invoke (DBr. 45)

unexplained "experience" to justify a presumption. Not only does the Department have no experience with the new borrower-defense standards, but the Department failed to marshal that experience to explain why it meets the *Chemical Manufacturers* test.

The presumption, while nominally rebuttable, is impermissibly unrebuttable in practice. Information on reliance, injury, and attendance decisions is in the sole possession of the borrower, but there is no mechanism in either the discharge or recoupment proceedings—by discovery, witness examination, or otherwise—to enable a school to prove lack of reliance and injury. Such a procedure is arbitrary and violates due process. CCSTBr. 51-52.

The Department does not deny the absence of any such mechanism under its one-sided rules. It merely offers *ipse dixit* (DBr. 46-47) that schools have "robust protections" and "a full opportunity" to counter the presumption. But the Rule's presumptions and procedures do not promote efficient adjudication—they are improper policy mechanisms designed to maximize loan forgiveness at the expense of proprietary schools.

### 4.    The Rule's closed-school-discharge provisions are unlawful.

The HEA authorizes a loan discharge if "the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which

such student is enrolled *due to the closure of the institution*." 20 U.S.C.
§ 1087(c)(1) (emphasis added). The Rule violates this statute.

The statute requires proof that the school's closure *caused* the student's
inability to complete the program.[9] Under the Rule, however, once a school closes,
the Department discharges the loans of any student who had withdrawn 180 days
before its closure date or later. 34 C.F.R. § 685.214(d). The Department posits
(DBr. 49) a scenario where the imminent closure of a school might have caused the
student to withdraw. But causation has to be proven; a student can withdraw for
many reasons, and the HEA does not provide for a discharge *unless* the withdrawal
was caused by the institution's closure.

Furthermore, the Rule defines "closure date" to include the date on which a
location "ceased to provide educational instruction in programs in which *most*
students at the school were enrolled." 34 C.F.R. § 685.214(a)(2)(i) (emphasis
added). That may occur if a school simply transfers a program to another location.
By granting automatic discharges based on student withdrawals that occur
potentially years before the school closes, without proof that the actual closure of
the school prevented the student from completing the program, the Rule abrogates
the requirement that discharges may only be granted when the student's inability to

---

[9] A "school" is defined in the closed-school-discharge regulations as "a school's
main campus or any location or branch of the main campus." 34 C.F.R.
§ 685.214(a)(2)(ii).

complete the program is "due to the closure of the institution." 20 U.S.C.

§ 1087(c)(1).

The Department's defense of the automatic-discharge provision fares no

better. All the Department needs to find for automatic discharge is that one year

after closure (or one year after the last date of attendance at an uncompleted

continuation program), the student has not accepted (or has failed to complete) a

"program at another branch or location of the school or through a teach-out

agreement" at a similarly accredited school. 34 CFR § 685.214(c). The Department

incorrectly states (DBr. 50) that "the HEA does not foreclose the Department's

approach." To the contrary, the HEA requires that the school's closure *cause* the

student's inability to complete her program.

### B.    The equities favor CCST.

The Department's equitable arguments are unavailing. It asserts (DBr. 50)

that postponing the Rule would leave the Department without "a viable process for

resolving disputes over fraudulent or defective debts." It blames (DBr. 51) previous

iterations of its regulations for a massive backlog of unresolved claims, which

leave borrowers "in an extended state of financial uncertainty."

Even if the Rule's shortcuts were the only solution to the Department's

staffing shortfalls, this problem would not justify the derogation of due process and

other rights that schools would suffer as a result. If the Court agrees that the Rule is

likely invalid, then, absent a postponement of its effective date, borrowers and schools alike would be made to participate in proceedings for naught. Equity does not require waste.

### C.    Postponement of the effective date should not be party-restricted.

The Department's suggestion (DBr. 52) that Article III and principles of equity prevent a federal court from granting an APA plaintiff relief beyond its own interests is unfounded. The Supreme Court has ruled to the contrary, holding that an APA plaintiff who demonstrates injury from an agency action may vindicate the public interest more broadly:

> [T]he fact of economic injury is what gives a person standing to seek judicial review under the statute, but, once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate. … [W]e have used the phrase "private attorney general" to describe the function performed by persons upon whom Congress has conferred the right to seek judicial review of agency action.

*Sierra Club v. Morton*, 405 U.S. 727, 737-38 (1972); *see also Bennett v. Spear*, 520 U.S. 154, 165 (1997).

Accordingly, relief under the APA is not restricted to the plaintiff's individual interests. Section 706 mandates that if a plaintiff ultimately prevails, the district court "shall … set aside" the challenged action, not merely bar its enforcement against the plaintiff. 5 U.S.C. § 706; CCSTBr. 57. "When a reviewing

court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). As Justice Kavanaugh explained in the related context of the Hobbs Act,

> If the court of appeals in a facial, pre-enforcement action determines that the order is invalid and enjoins it, the agency can no longer enforce the order. By contrast, if the district court disagrees with the agency's interpretation in an enforcement action, that ruling does not invalidate the order and has no effect on the agency's ability to enforce the order against others.

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S.Ct. 2051, 2063 (2019) (Kavanaugh, J., concurring in the judgment).

Section 705 of the APA should be interpreted in light of the ultimate relief. It empowers reviewing courts to "postpone the effective date of the agency action," 5 U.S.C. § 705; thus, this Court may properly postpone the effective date of the challenged provisions of the Rule in their entirety, and not just as to CCST.[10]

## CONCLUSION

This Court should (1) postpone (or direct the district court to postpone) the Rule's effective date and (2) maintain the temporary injunction until such postponement is entered.

---

[10] CCST does not seek postponement of the unchallenged regulations that were promulgated in the same rulemaking but are not part of this action. *Contra* DBr. 53.

Dated:  October 23, 2023                    Respectfully submitted,

                                             _/s/ Stephen B. Kinnaird_

Philip Vickers                               Stephen B. Kinnaird
Katherine Hancock                            Allyson B. Baker
CANTEY HANGER LLP                            Michael Murray
600 West 6th Street, Suite 300               Sameer P. Sheikh
Fort Worth, TX 76102                         Tor Tarantola
pvickers@canteyhanger.com                    PAUL HASTINGS LLP
(817) 877-2800                               2050 M Street NW
                                             Washington, DC 20036
                                             stephenkinnaird@paulhastings.com
                                             (202) 551-1700

                                             *Counsel for Plaintiff-Appellant*

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that

on October 23, 2023, I caused the foregoing to be filed via the Court's CM/ECF

system and served by email on the following counsel for Defendants-Appellees:

Christine L. Coogle (christine.l.coogle@usdoj.gov)
Cody T. Knapp (cody.t.knapp@usdoj.gov)
R. Charlie Merritt (robert.c.merritt@usdoj.gov)
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005

Joshua Marc Salzman (joshua.m.salzman@usdoj.gov)
Jennifer L. Utrecht (jennifer.l.utrecht@usdoj.gov)
U.S. Department of Justice
Civil Division
Appellate Staff
950 Pennsylvania Avenue NW
Washington, DC 20530

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
*Attorney for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,**
**TYPFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

This document complies with the word limit of Fed. R. App. P.

32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R.

App. P. 32(f), it contains 6,487 words. This brief also complies with the typeface

requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style

requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a

proportionally spaced typeface using Microsoft Word in 14-point Times New

Roman font. Additionally, I certify that any required redactions have been made in

compliance with 5th Cir. R. 25.2.13.

_/s/ Stephen B. Kinnaird_
Stephen B. Kinnaird
*Attorney for Plaintiff-Appellant*

Dated: October 23, 2023